James L. SNYDER, Petitioner

v.

STATE ETHICS COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 1996.

Decided Dec. 18, 1996.

**3.** The "intention" of the parties to a release is not relevant, provided the language contained therein is clear and unambiguous. See *Wolbach*, supra; *Estate of Bodnar*, supra; *Hasselrode*, supra. Such is not the case here, however, with the patent ambiguity created by Release No. 1 (in Paragraphs 1 and 2) and Release No. 2. Thus, inquiry into the "intention" of the parties is appropriate to resolve the scope of the releases.

With the submission of the plaintiff's and her attorney's affidavits revealing an "intention" to restrict the releases to Jensen Paint Company (see Appellant's Reproduced Record at 67 & 68), to complete this picture the "intention" of Jensen Paint Company in drafting Release No. 1 is needed. This will afford the court with all relevant information required to decide the issue of fact as to which release will prevail. Cf. *American Vending Co. v. Brewington*, 289 Pa.Super. 25, 432 A.2d 1032, 1036 (1981) ("Normally, such a determination of credibility is within the prerogative of the trial court even if it is based upon its review of transcripted depositions.").

Girard E. Rickards, Harrisburg, for petitioner.

John J. Contino, Executive Director, Harrisburg, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., KELTON, Senior Judge.

FRIEDMAN, Judge.

James L. Snyder appeals from the February 16, 1996 order (2/16/96 Order) of the State Ethics Commission (SEC) which concluded that Snyder had violated section 3(a)

of the State Ethics Law (Ethics Law).[1] The SEC issued the 2/16/96 Order after its Investigative Division requested and received reconsideration of the SEC's prior August 3, 1995 order (8/3/95 Order), which had concluded that Snyder had not violated the Ethics Law.

Since 1988, Snyder has served as a Supervisor for Lower Paxton Township (Township). (SEC's 2/16/96 Order, Finding of Fact, No. 2.)[2] He also owns the Snyder Stone Company (Snyder Stone), a business specializing in selling and applying masonry products. (SEC's 2/16/96 Order, Findings of Fact, Nos. 3-4.) Snyder's alleged Ethics Law violations occurred in regard to two business projects Snyder Stone was involved in during the time Snyder was a Township Supervisor: the Colonial Commons Shopping Center (Colonial Commons), developed by New Market Development Company (New Market), and Blue Meadow Farms (Blue Meadow), developed by Triple Crown Corporation (Triple Crown).

### Colonial Commons

The Township Board of Supervisors (Board) first discussed the Colonial Commons project at a public workshop meeting on April 10, 1989, but took no action at that time. (SEC's 2/16/96 Order, Finding of Fact, No. 26(d).) A few months later, on Snyder's motion, the Board unanimously voted to rezone the Colonial Commons site for New Market. (SEC's 2/16/96 Order, Finding of Fact, No. 47.) The Board, including Snyder, voted on Colonial Commons-related issues at least two more times before December 11, 1989, at which time the Board discussed the preliminary plans for Colonial Commons at a second workshop meeting; at this meeting, Snyder encouraged the Board to proceed with the project. (SEC's 2/16/96 Order, Findings of Fact, Nos. 48-50.)

Three days after the second workshop meeting, Snyder Stone made three calls to Ogram Architects (Ogram),[3] the architect for the Colonial Commons project. (SEC's 2/16/96 Order, Finding of Fact, No. 38(w).) On December 15, 1989, Snyder and his wife incorporated Snyder Stone. (SEC's 2/16/96 Order, Findings of Fact, Nos. 4, 45(a).) Thereafter, Snyder Stone made several more calls to Ogram on December 15, 18, and 19, 1989, and January 9, 10, and 15, 1990; between December 14, 1989 and September 26, 1990, a total of fourteen calls were made. (SEC's 2/16/96 Order, Findings of Fact, Nos. 38(w), 83(a).)

In late 1989 or early 1990, Snyder contacted Herbert, Rowland & Grubic, Inc. (HRG), a consulting firm, regarding hiring HRG to do "quantity takeoffs" for the stonework at Colonial Commons.[4] (SEC's 2/16/96 Order, Finding of Fact, No. 33.) On January 22, 1990, the Board, including Snyder, unanimously voted to give preliminary approval, subject to conditions, to the Colonial Commons' Preliminary Subdivision and Land Development Plan. (SEC's 2/16/96 Order, Findings of Fact, Nos. 32(c), 52.) After receiving verbal authorization, HRG did the quantity takeoff for Snyder Stone by February 3, 1990. (SEC's 2/16/96 Order, Findings of Fact, Nos. 33(d),(e).)

1. Act of June 26, 1989, P.L. 26, 65 P.S. §§ 401-13. Although the Pennsylvania Superior Court has referred to this law as the Conflict of Interest Law (COIL) in *Commonwealth v. Parmar,* 448 Pa.Superior Ct. 470, 672 A.2d 314, *appeal granted,* —— Pa. ——, 683 A.2d 879 (1996), we will continue to use the traditional name for this act, which was not given a specific designation by the legislature.

2. We note that the SEC's "Findings of Fact" are, essentially, merely a reiteration of the pleadings and testimony adduced at the hearings; however, all relevant findings were adopted and incorporated into the SEC's subsequent discussion. Thus, we will treat the SEC's Findings of Fact as such.

3. Although no direct evidence proves that Snyder himself made the calls on behalf of Snyder Stone, the SEC concluded, based upon the testimony of Snyder and his wife, that Snyder was the only person who could have placed the calls. (SEC's 2/16/96 Order at 59.)

4. A "quantity takeoff" is an estimate of the materials required to complete a project or a portion of a project in accordance with certain plans and specifications. It is prepared using the architectural plans. (SEC's 2/16/96 Order, Finding of Fact, No. 33.)

Hoar Construction Co. (Hoar), a company bidding to be the general contractor on the Colonial Commons project, received Snyder Stone's bid by February 22, 1990 and, that same day, Hoar submitted its guaranteed maximum price for the stonework on the project, based partially on Snyder Stone's estimate, to New Market. (SEC's 2/16/96 Order, Findings of Fact, Nos. 29(j), (o).) Snyder Stone's bid was the only bid Hoar received for the stonework at Colonial Commons. (SEC's 2/16/96 Order, Finding of Fact, No. 29(j).)

Between February 24, 1990 and March 3, 1990, the Harrisburg Builders' Show took place. At the show, Snyder entered into an oral contract with Edward Sinko and David Horvath, d/b/a Rustic Exteriors, installers of stone veneer, to install the stone at Colonial Commons. (SEC's 2/16/96 Order, Findings of Fact, Nos. 17, 18, 35.)

On February 26, 1990, the Board, including Snyder, unanimously voted to approve, subject to conditions, the Final Subdivision and Land Development Plan for Colonial Commons, and also to execute the Development Agreement for Colonial Commons. (SEC's 2/16/96 Order, Finding of Fact, No. 53.) This approval was slightly modified by subsequent votes of the Board on March 5, 1990 and March 19, 1990. (SEC's 2/16/96 Order, Findings of Fact, Nos. 54, 55.) Also at the March 19, 1990 meeting, the Board unanimously voted to approve the establishment of a guarantee for Colonial Commons in the amount of $1,213,300.00, commencing March 14, 1990 and ending February 19, 1992. (SEC's 2/16/96 Order, Finding of Fact, No. 55.)

On April 7, 1990, New Market entered into a contract with Hoar, which provided that Hoar would be the general contractor on the Colonial Commons project. (SEC's 2/16/96 Order, Findings of Fact, Nos. 28(c), 29(q).) Hoar subcontracted the stonework to Snyder Stone on May 23, 1990, (SEC's 2/16/96 Order, Finding of Fact, No. 78); however, Hoar had known since February 22, 1990 that Snyder Stone was the only bidder for the subcontract, (SEC's 2/16/96 Order, Finding of Fact, No. 29(s)(1)).

During the summer of 1990, Snyder Stone began construction at Colonial Commons; while working on the project, Snyder told Clare Newswanger, part owner of Schuylkill Stone, a company similar to Snyder Stone, that he had gotten the job long before Newswanger ever knew about it. (SEC's 2/16/96 Order, Findings of Fact, Nos. 31(g), 34.) Newswanger testified that he understood Snyder's statement to mean that Snyder had "some type of connection that [Newswanger] didn't have." (SEC's 2/16/96 Order, Finding of Fact, No. 34.) Also at this time, Snyder assured Rustic Exteriors not to worry about collecting payment for back charges Snyder Stone owed to Rustic Exteriors because Snyder had "pulled some strings" to have the paving at Colonial Commons done after the Township's winter paving deadline and that he was owed some favors. (SEC's 2/16/96 Order, Finding of Fact, No. 36(c).) Lastly, while Snyder Stone was working on Colonial Commons, the Township Manager asked the Township Solicitor whether a Supervisor could vote on matters where he or she might have a personal interest; the Solicitor responded that such could be done if the official declared the conflict on the record and filed a written statement to that effect. (SEC's 2/16/96 Order, Finding of Fact, No. 37(b).) In the Solicitor's opinion, Snyder Stone's contract with New Market for the Colonial Commons project would not automatically disqualify Snyder from voting on matters affecting Colonial Commons, but would require Snyder to meet these notice requirements. (SEC's 2/16/96, Finding of Fact, No. 37(b).) The Solicitor prepared such a form and Snyder received it; however, Snyder refused to complete and sign the form. (SEC's 2/16/96 Order, Finding of Fact, No. 37(b).)

In November 1990, as the Township paving deadline approached, according to David Horvath of Rustic Exteriors, Snyder stated that he was going to use his position in the Township to get the paving deadline pushed back, and that there was going to be an exchange of favors that would lead to money going through channels faster so that Snyder Stone would pay Rustic Exteriors faster. (SEC's 2/16/96 Order, Finding of Fact, No. 35.)

Meanwhile, Snyder either abstained from, or was not present at, the meetings that winter at which the Board addressed, and ultimately adopted, an ordinance which changed paving specifications for private parking lots. (SEC's 2/16/96 Order, Finding of Fact, No. 39(ii).) However, on December 17, 1990, the day a motion to direct the Solicitor to prepare an amendment to the ordinance failed by a 2–1–2 vote, with Snyder abstaining, a call was made from Snyder Stone to New Market; on the following day, calls were made from Snyder Stone to both New Market and Hoar. (SEC's 2/16/96 Order, Findings of Fact, Nos. 38(x), 58.) The paving ordinance was eventually unanimously approved on February 25, 1991; although Snyder was not present at the meeting, his signature is, nonetheless, on the ordinance. (SEC's 2/16/96 Order, Findings of Fact, Nos. 12, 59, 72.)

### Blue Meadow

As a Supervisor, Snyder had voted on issues concerning Triple Crown and Blue Meadow prior to the start of Snyder Stone's business relationship with the development. (SEC's 2/16/96 Order, Findings of Fact, Nos. 39(c), 55(c).) Snyder continued to vote on Triple Crown and Blue Meadow issues after he began work for Triple Crown at Blue Meadow in 1992.

From the start of 1992 until August 3, 1992, Snyder voted at least four times on issues concerning Blue Meadow, each time in Blue Meadow's favor. (SEC's 2/16/96 Order, Findings of Fact, Nos. 39(k), (l ), 60–62.) On August 17, 1992, the Board, including Snyder, voted to grant reaffirmation of the Final Subdivision Plan for Blue Meadow, Phase 4, conditioned on the establishment of the proper improvement guarantee. (SEC's 2/16/96 Order, Finding of Fact, No. 63.) Likewise, on September 14, 1992, Snyder voted with the Board to approve the Preliminary/Final Re-subdivision Plan of Lot 26 of Blue Meadow. (SEC's 2/16/96 Order, Finding of Fact, No. 64.) In 1993, Snyder voted at least four more times, each time in Blue Meadow's favor, on Blue Meadow-related issues such as final subdivision plans of various lots in the development. (SEC's 2/16/96 Order, Findings of Fact, Nos. 65–68.)

In 1994, Triple Crown sought a curative zoning amendment regarding Blue Meadow. At the April 18, 1994 meeting on the issue, Snyder disclosed publicly for the first time that his company had a business relationship with Triple Crown, but claimed that the relationship did not place Snyder in a position to benefit from the curative amendment and that he had not been promised or offered any inducements for his vote. (SEC's 2/16/96 Order, Finding of Fact, No. 69.) After tabling the curative amendment issue in April, the Board, including Snyder, once again voted to table the issue on May 2, 1994. (SEC's 2/16/96 Order, Finding of Fact, No. 70.) On May 16, 1994, Snyder's vote helped defeat a motion to deny the curative amendment. (SEC's 2/16/96 Order, Finding of Fact, No. 71.) Also at this meeting, a member of the public raised the issue of Snyder's business relationship to Triple Crown and his work in Blue Meadow. The Solicitor stated that Snyder's only obligation was to disclose his relationship with Triple Crown and that Snyder was free to vote or not vote as he chose. (SEC's 2/16/96 Order, Finding of Fact, No. 71.)

In mid-April 1993, SEC Deputy Executive Director and Director of Investigations Robert Caruso began receiving anonymous calls about Township officials, including Snyder. (SEC's 2/16/96 Order, Finding of Fact, No. 38(j).) Caruso directed SEC Investigator Frank Finegan to conduct a Statement of Financial Interests compliance audit of the Township,[5] which Finegan did in May 1993. (SEC's 2/16/96 Order, Findings of Fact, Nos. 38(k), 43(d).) Finegan found no nonfilings, deficient filings, or unsigned or undated Statements of Financial Interest; however, Finegan does not recall making a report to Caruso about Snyder at the completion of the audit. (SEC's 2/16/96 Order, Findings of Fact, Nos. 43(g),(h).)

---

5. A Statement of Financial Interests compliance audit is different from an investigation and the Investigative Division routinely performs such audits that have nothing to do with investigations. (SEC's 2/16/96 Order, Finding of Fact, No. 38(k).)

On June 4, 1993, the Dauphin County District Attorney sent the Investigative Division a copy of a letter and a package of information regarding Snyder, prompting the Investigative Division and local law enforcement officials to discuss who would pursue the investigation. The state police decided not to investigate the matter and, on August 10, 1993, SEC Executive Director John Contino approved this case for docketing and preliminary investigation. (SEC's 2/16/96 Order, Findings of Fact, Nos. 38(*l*)–(q), 43(j),(k).)

On October 8, 1993, Caruso notified Snyder by letter of the general allegations against him, warning him that the Investigative Division was commencing a full investigation of the matter. (SEC's 2/16/96 Order, Findings of Fact, Nos. 1, 38(s).) The Investigative Division issued its investigative complaint nearly a year later, on October 3, 1994. (SEC's 2/16/96 Order, Finding of Fact, No. 38(v).)

Following hearings before a Hearing Examiner, the SEC issued the 8/3/95 Order stating that Snyder had not violated the Ethics Law. After SEC granting the Investigative Division's petition for reconsideration, however, the SEC issued the 2/16/96 Order, this time concluding that Snyder had violated the Ethics Law by participating in the Board's deliberations concerning the private developments of Colonial Commons and Blue Meadow while Snyder Stone pursued, and engaged, in business relationships with the developers of these projects.[6]

On appeal to this court,[7] Snyder first argues that the SEC erred as a matter of law in reversing its 8/3/95 Order because the Investigative Division failed to present competent evidence that Snyder's conduct constituted a conflict of interest as defined by section 2 of the Ethics Law, 65 P.S. § 402,[8] and Pennsylvania case law.[9] Specifically, Snyder claims that the SEC's Findings of Fact:

> are not supported by substantial evidence sufficient to show by clear and convincing proof, that [Snyder] violated the Ethics [Law] by competitively bidding for [Snyder Stone] to work on the [Colonial Commons] project before Final Approval of [the] Subdivision Plan for [Colonial Commons] by the [Board], or by voting on matters concerning [Triple Crown or Blue Meadow] before Final Approval of its Subdivision Plan by the [Board].

Although framed as a substantial evidence question, it is apparent from his argument that Snyder actually is challenging the conclusions of law drawn from the SEC's findings. In his defense, Snyder puts forth a host of reasons why his votes on issues concerning Colonial Commons, Blue Meadow and their developers did not constitute conflicts of interest. Snyder maintains that: (1) his votes after preliminary project approval were irrelevant because, once the Board approves a preliminary plan, the Board is then required to approve a conforming final plan; (2) he publicly acknowledged his business relationship with Triple Crown at the April

---

**6.** Section 8(g) of the Ethics Law, 65 P.S. § 408(g), requires at least four members of the Commission present at a meeting to find a violation by clear and convincing proof.

**7.** Our scope of review of a decision of the SEC is limited to determining whether necessary factual findings are supported by substantial evidence, an error of law has been committed or constitutional rights have been violated. *R.H. v. State Ethics Commission*, 673 A.2d 1004 (Pa.Cmwlth. 1996). Substantial evidence is such evidence that a reasonable person would consider adequate to support the finding. *Id.*

**8.** Section 3(a) of the Ethics Law provides: "[n]o public official or public employee shall engage in conduct that constitutes a conflict of interest." 65 P.S. § 403(a). "Conflict of interest" is defined as: "[u]se by a public official ... of the

authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself ... or a business with which he or a member of his immediate family is associated...." 65 P.S. § 402.

**9.** Snyder also asserts that there was not clear and convincing evidence that he violated the Ethics Law because no substantial evidence exists to indicate that he used confidential information received through his position as a supervisor to obtain contracts for Snyder Stone. We note, however, that the SEC did not determine that Snyder violated the Ethics Law through the use of confidential information; rather, the SEC concluded that it was Snyder's *use of office* for private pecuniary benefit which violated the Ethics Law. Thus, we need not address this argument.

18, 1994 Board meeting; (3) his vote was never needed for a quorum or majority; and (4) he did not improperly use his influence as a supervisor to gain the contracts. We are not, however, convinced by any of these arguments.

 Regarding Snyder's first argument, the SEC's findings are fully supported by the record and reveal that Snyder actively pursued the contract with New Market for Colonial Commons, not only after, but also prior to, approval of the preliminary plan.[10] Moreover, although the Board must approve a final plan which conforms to the preliminary plan, the Board must first determine whether the final plan does, indeed, conform. In fact, the Colonial Commons "Final Plan" was changed more than once after "approval." Thus, conflicts of interest are still possible after preliminary approval has been granted.

 With respect to Snyder's public announcement of Snyder Stone's involvement in the Blue Meadow project, the SEC's findings indicate that Snyder actively participated in votes concerning Blue Meadow while engaging in an undisclosed business relationship with Triple Crown. Indeed, not only did his announcement come more than two years after the conflict of interest allegedly began, but Snyder continued to vote on such issues both on the night he made the announcement

and thereafter.[11] Moreover, even if we were to agree that such a belated disclosure of a conflict of interest is enough to remove a supervisor from the reach of the Ethics Law, Snyder never disclosed to the Board his business relationship with Colonial Commons.

 We are likewise unconvinced by the fact that Snyder's vote was never controlling or necessary for a quorum. Snyder violated the Ethics Law by discussing and voting on issues in which he had a private pecuniary interest, not by affecting the outcome of those votes. Similarly, it is irrelevant whether Snyder improperly used his influence as a Supervisor to gain the Colonial Commons and Blue Meadow contracts; Snyder may have been able to obtain the jobs even if he were not a Supervisor, but as a Supervisor, he should not have considered and voted on issues involving his personal business dealings.

Snyder next argues that the Hearing Examiner violated his constitutional right to due process by refusing to permit him to call John Contino, Executive Director of the SEC and prosecuting attorney in Snyder's case, as a witness at the hearing. Snyder attempted to call Contino to testify regarding when the investigation of Snyder began and how it was handled. Snyder believed that Contino's tes-

---

**10.** The evidence indicates that Snyder's business involvement in the Colonial Commons project began well prior to the Board's approval of the preliminary plan. Snyder began pursuing the stonework contract by December 14, 1989, the date of his first phone call to Ogram and also the day before Snyder incorporated Snyder Stone; at this time, the Board had been discussing Colonial Commons for at least nine months. This first call was followed by more calls between Snyder Stone and Ogram, all before the Board granted preliminary approval of Colonial Commons' plans on January 22, 1990. In fact, by the time Snyder voted to approve the preliminary plan for Colonial Commons, Snyder had already taken necessary steps to obtain the stonework contract. This is supported by the testimony of Jerry Cross, Vice President and Project Management Coordinator for Hoar, who verified that all of his pre-approval conversations with Snyder regarded the proposal to do stonework at Colonial Commons.

In the period from the preliminary approval until the final approval was granted, Snyder prepared and submitted a bid for the project, lined up installers to assist him, and continued to

communicate with the project architect and Hoar, the company which would later become the general contractor. By the time Snyder voted with the Board on February 26, 1990 to approve Colonial Commons' Final Plan, it was clear that Snyder Stone's bid was the only bid Hoar received for the stonework. At all times, while Snyder continued to vote on issues concerning Colonial Commons and New Market, he never publicly disclosed his intention to secure for Snyder Stone the stonework job at Colonial Commons or his successful bid to do the stonework for the project.

**11.** Regarding the Blue Meadow contract, although Snyder had voted against Triple Crown's interests prior to the formation of a business relationship between Triple Crown and Snyder Stone, once the relationship had been formed, Snyder voted consistently in Triple Crown's favor. In fact, Snyder successfully presented a motion before the Board to drastically reduce Triple Crown's improvement guarantee and also helped table and, finally, defeat a motion to deny Triple Crown's proposed curative zoning amendment.

timony would support Snyder's contention that the investigation was not conducted within the strict time limits of section 8 of the Ethics Law, 65 P.S. § 408.[12] The Investigative Division maintains that the preliminary investigation of Snyder began on August 10, 1993, and was initiated on Contino's motion. However, Snyder contends that, in light of the fact that the SEC received anonymous telephone calls concerning Snyder and other supervisors as early as mid-April 1993, and that the Investigative Division had sent investigators to review financial interest statements in June, the docket date of August 10, 1993 is not, in fact, the date the preliminary investigation began. Therefore, Snyder argues that, because Contino's testimony was crucial to establish the exact date that the investigation began, the Hearing Examiner violated his constitutional right to due process by denying his request to call Contino to testify.

■ It is fundamental that hearing examiners enjoy wide latitude in governing the admissibility of evidence in an administrative proceeding. *Lee National Corp. v. Unemployment Compensation Board of Review*, 206 Pa.Superior Ct. 96, 211 A.2d 124 (1965). In addition to the foregoing, the presiding officer can surely refuse to permit the testimony of a witness who is called without prior notice, especially if such can prejudice the parties, disrupt the orderly and efficient trial

of the matter or if such is done in bad faith. *Walker Pontiac, Inc. v. Department of State, Bureau of Professional and Occupational Affairs*, 136 Pa.Cmwlth. 54, 582 A.2d 410 (1990), *appeal granted*, 530 Pa. 650, 607 A.2d 258 (1992).

■ Here, Snyder was not denied due process by the Hearing Examiner's refusal to permit him to call opposing counsel as a witness. We note that Snyder previously had not indicated an intent to call Contino to the stand. Moreover, because a lawyer may not act as an advocate in a proceeding in which the lawyer is also a witness, *see* Rule 3.7 of the Rules of Professional Conduct, Cortino would have been forced to disqualify himself during the hearing from representing his client. Such a situation would certainly have prejudiced the SEC and disrupted the trial. Thus, we cannot say that the Hearing Examiner abused his discretion in refusing to allow Snyder to call opposing counsel as an unannounced witness.

■ Snyder next argues that the SEC failed in two ways to meet the statutorily-imposed time limits regarding its investigation into his alleged conduct. First, Snyder claims that, because the preliminary investigation began earlier than August 10, 1993, the date the SEC claims it began, all subsequent deadlines under section 8 of the Ethics Law were not met. Snyder maintains that

---

**12.** Section 8 of the Ethics Law provides in relevant part:

(a) Upon a complaint ... or upon its own motion, the commission, through its executive directors, shall conduct a preliminary inquiry into any alleged violation of this act.

. . . .

The commission shall complete its preliminary inquiry within 60 days of its initiation.

(b) If a preliminary inquiry fails to establish reason to believe that this act has been violated the commission shall terminate the inquiry and so notify the complainant and the person who had been the subject of the inquiry. If the commission determines that a complaint is frivolous, it shall so state.

(c) If a preliminary inquiry establishes reason to believe that this act has been violated, the commission may, through its executive director, initiate an investigation to determine if there has been a violation.... No investigation may be commenced until the person who is the subject of the investigation has been · notified and provided a general statement of

the alleged violation or violations of the act and other applicable statutes with respect to such investigation.... The commission shall, within 180 days of the initiation of an investigation, either terminate the investigation ... or issue a findings report.... Upon a showing by the executive director of the need for extension of this period, the commission may extend an investigation for up to two 90–day periods, provided that each 90–day extension shall be approved by a majority vote of members present. In no event shall a findings report be issued later than 360 days after initiation of an investigation.

. . . .

(f) Within 30 days of the receipt by the commission of the hearing record, or, if no hearing is to be held, within 30 days of the receipt by the commission of the response to the findings report, the commission shall issue an order which shall be final. Upon receipt of a final order, the subject shall have the right to file a petition for reconsideration in accordance with the regulations of the commission.

the preliminary investigation began as early as mid-April 1993, when the SEC received the anonymous phone calls, or May 1993, when the audit of his Financial Interest Statements was conducted; thus, because the full investigation did not begin until October 8, 1993, the SEC failed to comply with the strict time limits of the Ethics Law. In support, Snyder cites *R.H. v. State Ethics Commission*, 673 A.2d 1004 (Pa.Cmwlth.1996), in which this court held the SEC strictly to the timelines established by the current Ethics Law.[13] Snyder asserts that here, as in *R.H.*, because the preliminary investigation actually began prior to the date alleged by the SEC, we must reverse the SEC's order.

The SEC, however, maintains that the preliminary investigation of Snyder began on August 10, 1993, and was completed on October 8, 1993, less than 60 days later; consequently, the investigative complaint issued on October 3, 1994 was timely because it was issued less than 360 days after completion of the preliminary investigation. According to the SEC, there is no evidence that any investigation occurred prior to the August 10, 1993 docket date. The SEC asserts that the inspection of the Supervisors' Statements of Financial Interests which occurred in May 1993 was not directed at Snyder in particular; moreover, the specific procedures and penalties regarding failure to comply with the filing requirements are separate from the provisions relating to investigation for other alleged violations of the Ethics Law. The SEC explains the time between receipt of the letter on June 4, 1993 and the opening of the preliminary investigation on August 10, 1993 as time spent, not on actual investigation but, rather, in discussion with law enforcement agencies to determine who, if anyone, would conduct such an investigation. Thus, because the investigation did not specifically begin until August 10, 1993, the SEC asserts that it complied with the mandates of the Ethics Law. We agree.

Although the SEC did not begin its investigation as early as it could have, no evidence exists to establish that the investigation was, in fact, begun earlier than August 10, 1993. Further, we differentiate the facts presented here from those in *R.H.*. In *R.H.*, the evidence showed that the SEC had been obtaining critical evidence against the supervisors for years before "officially" beginning the preliminary investigation into violations of the current Ethics Law; moreover, the SEC based its findings of violation, in part, upon the evidence accumulated during such time. Also, in *R.H.*, the SEC failed to provide the supervisors with 90–day status letters and obtain proper extensions. Here, there has been no showing that any relevant evidence was collected before August 10, 1993, much less that the SEC based its conclusion on any such evidence; additionally, the SEC complied with all other requirements of the Ethics Law, such as timely notifying Snyder of the investigation, sending Snyder 90–day status letters and properly requesting extensions. Thus, Snyder's argument must fail.

 Snyder also argues that the SEC failed to comply with section 8(f) of the Ethics Law, 65 P.S. § 408(f), by failing to issue the 8/3/95 Order within thirty days of receipt of the hearing record. Section 8(f) of the Ethics Law provides in relevant part:

> Within 30 days of the receipt by the commission of the hearing record, or, if no hearing is to be held, within 30 days of the receipt by the commission of the response to the findings report, the commission shall issue an order which shall be final.

65 P.S. § 408(f). At the conclusion of the June 1, 1995 hearing, the Hearing Examiner. left the testimonial portion of the proceedings open until June 9, 1995. No further testimony was taken and the record was closed. On June 14, 1995, the final notes of testimony were received and counsel were instructed to submit briefs by July 14, 1995. The SEC issued its decision on August 3,

---

**13.** The prior version of the Ethics Law did not have such strict time limits for the initiation, progression and termination of investigations. In *R.H.*, the SEC's investigation covered acts occurring over a period of years and falling under both the former law and the newer, stricter law. Because the SEC, in *R.H.*, did not comply with the time limits of the newer law, we reversed that part of the SEC's decision which held that the public officials had violated the newer act. However, because the earlier act had no such time requirements, we affirmed the SEC's conclusion that the public officials had violated the earlier act. *See R.H.*

1995. Snyder believes that the 8/3/95 Order was untimely because it was issued more than thirty days after the final notes of testimony were received on June 14, 1995. The SEC, on the other hand, contends that the 8/3/95 Order was timely because it was issued within thirty days after July 14, 1995, the day the briefs were due.

Although we disagree with the SEC's reasoning,[14] we agree that the decision here was timely. In light of our prior holdings that statutes which seek to impose time limitations on adjudicatory tribunals are directory only, *see, e.g., Baker v. Department of Public Welfare*, 138 Pa.Cmwlth. 607, 588 A.2d 1337 (1991); *West Penn Power Co. v. Pennsylvania Public Utility Commission*, 104 Pa. Cmwlth. 21, 521 A.2d 75 (1987), we decline to hold the SEC strictly to the 30–day time frame provided in section 8(f). As we stated in *West Penn:*

> We note initially that it was the *adjudicatory body,* not the litigants, which failed to comply with the time provision. For this reason we find this case analogous to *Moore Nomination Petition*, 447 Pa. 526, 291 A.2d 531 (1972). The issue in *Moore* was whether the provision in Section 977 of the Pennsylvania Election Code, requiring the Commonwealth Court to hold a hearing on a challenge to a nominating petition within certain time restrictions, was mandatory or directory. There, as here, the time constraint was one imposed upon the adjudicatory body, not the litigants. The *Moore* court explained that, while the legislature may fix a time within which ministerial acts of procedure must be performed by the litigants, it cannot fix a time in which the exercise of the purely judicial function must occur and, thus, when a statute appears to do so it will be construed as directory. Here, admittedly, the

> adjudicatory body is an administrative agency and not a court. And, if we construe the statute as mandatory, the effect is to punish at least one of the litigants for the actions of the adjudicator. Certainly the legislature could not have intended such a result. The claim here is one of genuine interest to the public and we believe that the legislature desire that such matters be heard and resolved by the Commission, provided that *the parties* have properly complied with mandatory deadlines *applicable to them.* We thus hold that the time limits in Section 332(g) are directory only and, accordingly, when they are not complied with they do not operate to deprive the Commission of authority to enter an order.

*Id.* 521 A.2d at 78. (Citations and footnote omitted) (emphasis in original.)

Because we have determined here that the Investigative Division complied with all mandatory deadlines applicable to it, and because the SEC's final order was issued timely, we cannot conclude that the SEC violated the Ethics Law so as to invalidate the 8/3/95 Order.[15]

Finally, we address Snyder's claim that the SEC erred as a matter of law by using flawed authority to support the Reconsideration Petition. Snyder argues that the SEC erred in its 2/16/96 Order because it ignored *Dodaro v. Com., State Ethics Commission*, 527 Pa. 539, 594 A.2d 652 (1991), a Pennsylvania Supreme Court case upon which the SEC relied when it issued its 8/3/95 Order. Snyder argues that because the SEC relied on *Dodaro* in its 8/3/95 decision in which the SEC found in his favor, and failed to consider *Dodaro* in its subsequent 2/16/96 Order in which the SEC found against him, the SEC

---

14. The SEC argues that the thirty-day period for it to issue its order did not begin to run until the day the briefs were filed; however, the SEC incorrectly maintains that briefs are part of a record. *See Zinman v. Commonwealth, Department of Insurance*, 42 Pa.Cmwlth. 270, 400 A.2d 689 (1979). Thus, the thirty-day period began to run on June 14, 1995, the day the final notes of testimony were received by the SEC.

15. We recognize the SEC's attempt in this instance to allow the parties sufficient time to file

briefs after the record closed, even though such action resulted in its order being issued more than thirty days after receipt of the hearing record. However, we note that this court has suggested in the past that agencies provide, by rule or otherwise, a time limit within which briefs should be filed which would enable counsel to file adequate briefs yet not preclude compliance with directory time requirements. *See Bengal v. State Board of Pharmacy*, 2 Pa.Cmwlth. 347, 279 A.2d 374 (1971).

erred. We do not agree. *Dodaro* is not dispositive of the issues presented here; moreover, the section of the Ethics Law applicable here has been amended since *Dodaro* was decided.[16] Thus, the SEC did not err by not relying upon *Dodaro*.

Accordingly, we affirm the SEC's 2/16/96 Order.[17]

### ORDER

AND NOW, this *18th* day of *December,* 1996, we affirm the February 16, 1996 order of the State Ethics Commission.

16. Because the events scrutinized in *Dodaro* took place prior to the 1993 amendments to the Ethics Law, *Dodaro* was not decided under the current conflict of interest standard which makes any private pecuniary gain to a public official a violation, whether or not such compensation is otherwise provided for by law. Rather, at the time relevant to *Dodaro*, section 3(a) of the Ethics Law provided:

No public official or public employee shall use his public office or any confidential information received through his holding public office to obtain financial gain other than compensation provided by law for himself, a member of his immediate family, or a business with which he is associated.

Act of October 4, 1978, P.L. 883. In *Dodaro,* we concluded that the public official did not violate the Ethics Law by participating in votes of the township's board of directors to hire his son for summer employment because the wages paid to the minor son for the temporary work were not "financial gain other than compensation provided for by law." *Id.* 594 A.2d at 655.

17. In addition to concluding that Snyder had violated section 3(a) of the Ethics Law, the 2/16/96 Order referred the matter to a law enforcement agency for review and appropriate action.