**Kenneth KISTLER, Petitioner**

v.

**STATE ETHICS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 10, 2008.

Decided Oct. 17, 2008.

---

1. As noted by the majority, it does not appear these six contested statements were relevant to the award.

Edmund J. Healy, Slatington, for petitioner.

Brian D. Jacisin, Harrisburg, for respondent.

BEFORE: LEADBETTER, President Judge, McGINLEY, Judge, FRIEDMAN, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, LEAVITT, Judge, and BUTLER, Judge.

## OPINION BY Judge FRIEDMAN.

Kenneth Kistler (Kistler) petitions for review of the June 29, 2007, order of the State Ethics Commission (Commission), which concluded, *inter alia*, that he violated sections 1103(a) and 1103(f) of the Public Official and Employee Ethics Act (Act).[1] We reverse.

Kistler is a member of the Carbon–Lehigh Intermediate Unit (CLIU) Board of Directors (Board) and was chairman of the Board's building committee from January 1988 until March 18, 2002. Kistler also is owner and president of Kistler Building Supply, Inc., and Kistler Pole Building Company. (Findings of Fact, Nos. 2, 5, 7, 10–11.)

## I. Factual Background

### A. Transportation Facility

In late 1999, the Board began to explore the possibility of constructing a garage (Transportation Facility) to house its buses. In June 2001, Robert J. Keegan, Jr., (Keegan), who was placed in charge of the project, discussed the project with Dale Roth (Roth), an architect who previously had done work for the CLIU. Keegan asked Roth to do a cost comparison to determine whether it would be more cost effective for the CLIU to take a lease-and-purchase approach as opposed to a purchase-and-build approach. (Commission's op. at 61–62.)

Between June and November 2001, there were discussions between Roth, or his staff, and Kistler about using a pole building for the Transportation Facility. In November 2001, Roth directed an associate of his to start looking at pole building options. The associate telephoned Kistler for information, but the associate did not indicate to Kistler the nature of the project. Another Roth associate subsequently requested a quote from Kistler for a main building and ancillary storage building. Kistler faxed a quote, but Kistler was unaware that the quote was related to Transportation Facility. (Commission's op. at 63–64.)

---

1. 65 Pa.C.S. §§ 1103(a) and 1103(f). Section 1103(a) of the Act states, "No public official ... shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). Section 1103(f) of the Act provides, in pertinent part, as follows:

No public official ... or any business in which the person ... is associated shall enter into any contract valued at $500 or more with the governmental body with which the public official ... is associated or any subcontract valued at $500 or more with any person who has been awarded a contract with the governmental body with which the public official ... is associated, unless the contract has been awarded through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded.

65 Pa.C.S. § 1103(f).

Sometime between February 21, 2002, and March 18, 2002, Roth told Kistler that he was considering a pole building for the Transportation Facility. Although Roth had not made a final decision, Roth was going to provide details about the project to Kistler, and Kistler was going to provide pricing and planning information to Roth. Afterward, Kistler informed the Executive Director of the CLIU that Roth was considering a pole building for the Transportation Facility and that, as a result, Kistler would need to leave his position on the Board's building committee. (Commission's op. at 64.)

At the March 18, 2002, Board meeting,[2] the Board accepted Kistler's resignation from the building committee. The Solicitor for the CLIU (Solicitor) expressed his opinion that Kistler could be involved in the construction of the Transportation Facility, but that he should abstain from any votes relating to that project. When the Board voted to make a Roth architectural firm, the Roth Marz Partnership, its agent in pursuing a lease-purchase agreement for the acquisition of property for the Transportation Facility, Kistler abstained.[3] The Board did not seek competitive bids because the Board believed that it could

pursue a lease-purchase agreement without doing so. (Commission's op. at 64–65.)

In May 2002, Roth made an initial commitment to Kistler to use Kistler Pole Building Company for construction of the Transportation Facility. On July 12, 2002, Kistler Pole Building Company entered into a Purchase Agreement contract with Cornerstone R.E., LLC, (Cornerstone), another Roth entity, for construction of the Transportation Facility. (Commission's op. at 65–66.)

At the Board meeting on July 15, 2002, the Board approved the execution of an Assignment of Real Estate Sales Agreement[4] to Cornerstone and a Lease Agreement and Option Agreement with Cornerstone. Kistler abstained from the vote.[5] In August, the CLIU entered into the Lease Agreement and Option Agreement. Kistler's company began construction in September and completed the Transportation Facility in early February 2003. (Commission's op. at 66–67.)

### B. Lehigh Learning and Adjustment School

In 1999, the CLIU entered into a lease with Steven Hirsh for the use of property in Oreville, Pennsylvania, for the Lehigh Learning and Adjustment School (LLAS).

2. All of the Board's public meetings are advertised in advance, with the Board's agendas given to the media, and are open to the public. (Commission's op. at 70.)

3. Kistler and the Solicitor both testified that Kistler disclosed his potential involvement in the construction of the Transportation Facility. (Commission's op. at 64–65.)

4. The CLIU had executed a Sales Agreement to purchase property for the Transportation Facility. (Commission's op. at 62.)

5. On August 19, 2002, Kistler filed two Conflict of Interest Abstention Memoranda, stating that he abstained from votes on March 18, 2002, and July 15, 2002, because he may be

involved in construction of the Transportation Facility. (Commission's op. at 65–66.) Kistler filed the documents pursuant to section 1103(j) of the Act, which provides:

> Any public official ... who in the discharge of his official duties would be required to vote on a matter that would result in a conflict of interest shall abstain from voting and, prior to the vote being taken, publicly announce and **disclose the nature of his interest as a public record in a written memorandum** filed with the person responsible for recording the minutes of the meeting at which the vote is taken....

65 Pa.C.S. § 1103(j) (emphasis added). The Commission declined to address whether, in filing the documents, Kistler complied with this provision. (Commission's op. at 74.)

However, the property had a problem with mold. Thus, at its June 17, 2002, meeting, the Board approved a motion terminating the lease with Hirsh and another motion authorizing Roth to pursue construction of an LLAS facility on property adjacent to Roth's Lehigh Valley office. Kistler voted in favor of the motions, having no idea that he would be involved in construction of the LLAS facility. (Commission's op. at 67.)

In April 2003, Kistler learned that Roth was considering a pole building for the LLAS facility. Afterward, Kistler had no involvement with the Board on that project. At the Board meeting on October 20, 2003, the Board authorized a Roth entity to begin construction of the LLAS facility, but Kistler abstained from the vote.[6] At the Board meeting on May 17, 2004, the Board approved a Lease Agreement between Roth and the CLIU for the LLAS facility, but Kistler abstained from the vote.[7] On June 17, 2004, Kistler and Roth executed a Purchase Agreement for construction of the LLAS facility. (Commission's op. at 68–69.)

By letter dated August 4, 2004, Kistler was notified that he was being investigated for possible violations of the Act. At the time, Kistler Pole Building Company had not begun construction of the LLAS facility. On August 20, 2004, Kistler requested an advisory from the Commission as to whether he would be in violation of the Act if he were to proceed to fulfill his contractual obligations with respect to the LLAS facility. By letter dated August 20, 2004,

the Commission responded that it could not issue an advisory on past conduct or matters under investigation. Kistler then contacted the Solicitor's law firm and received an opinion letter dated August 27, 2004, concluding that Kistler had not violated the Act. Kistler proceeded to build the LLAS facility based on that letter. Kistler began construction of the LLAS facility in September 2004 and completed it in January 2005. (Commission's op. at 69.)

## C. Commission Conclusions

After holding hearings on the matter, the Commission concluded that: (1) Kistler **unintentionally** violated section 1103(a) of the Act on June 17, 2002, when he voted to authorize Roth to pursue construction of the LLAS facility because, at the time, Kistler was engaged in business with Roth regarding the Transportation Facility;[8] (2) Kistler violated section 1103(f) of the Act on July 12, 2002, when his company entered into a subcontract with Cornerstone for construction of the Transportation Facility because the Board did not award the contract with Roth through an open and public process, i.e., through competitive bidding; and (3) Kistler violated section 1103(f) of the Act on June 17, 2004, when his company entered into a subcontract with Roth for construction of the LLAS facility because the Board did not award the contract with Roth through an open and public process, i.e., through competitive bidding.

---

6. Kistler testified that, in abstaining, he indicated that he might be involved in the construction of the building. On November 17, 2003, he filed an abstention memorandum stating that he had worked for Roth in the past. (Commission's op. at 68.)

7. Kistler testified that, in abstaining, he indicated that he might be involved in the construction of the building. (Commission's op. at 69.)

8. The Commission explained that Kistler's violation was unintentional because he voted based on the legal advice he received from the Solicitor; the Commission further stated that it was unfortunate Kistler did not seek an advisory on the matter. (Commission's op. at 75.)

The Commission recognized that Kistler did not intentionally violate section 1103(f) of the Act, noting that, in entering into the contracts with Roth, Kistler had relied on CLIU administrators and the Solicitor.[9] The Commission stated, "Kistler erroneously believed that [despite the Board's failure to seek competitive bids] he could lawfully enter into the aforesaid subcontracts." (Commission's op. at 80.) Kistler now petitions this court for review.[10]

## II. The Violations

■■■■ In a proceeding before the Commission, the Commission has the burden of proving a violation of the Act. *Pulice v. State Ethics Commission*, 713 A.2d 161 (Pa.Cmwlth.), *appeal denied*, 557 Pa. 642, 732 A.2d 1211 (1998). In order to find a violation of the Act, at least four members of the Commission must find clear and convincing proof of a violation. Section 1108(g) of the Act, 65 Pa.C.S. § 1108(g). Clear and convincing proof is evidence that is so clear, direct, weighty and convincing that it enables the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. *In re Adoption of Charles E.D.M.*, 550 Pa. 595, 708 A.2d 88 (1998).

### A. Open and Public Process

■■■■ Kistler first argues that the Commission erred in concluding that the "open and public process" in section 1103(f) of the Act must be a competitive bidding process. We agree.

Section 1103(f) of the Act allowed Kistler to enter into a subcontract with Roth for construction of the facilities if "the contract [between the CLIU and Roth was] awarded through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded." 65 Pa.C.S. § 1103(f).

Initially, we point out that, in setting forth the purpose of the Act, the legislature understood that "**clear** guidelines are needed in order to guide public officials ... in their actions. Thus, the General Assembly ... intends to **define as clearly as possible** those areas which represent conflict with the public trust." Section 1101.1(a) of the Act, 65 Pa.C.S. § 1101.1(a) (emphasis added). Section 1103(f) of the Act does **not** clearly define the "open and public process" as a competitive bidding process.

Indeed, when the legislature intends to define an "open and public process" as a competitive bidding process, the legislature makes its intent clear. For example, section 6017(c)(3) of the Pennsylvania Convention Center Authority Act states that certain individuals shall not enter into a contract valued at $500 or more "unless the contract has been awarded **to the lowest responsible bidder** through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded." 64 Pa.C.S. § 6017(c)(3) (em-

---

9. A public official who acts in good faith reliance on a written, non-confidential opinion of the solicitor of the political subdivision, or upon the solicitor's opinion publicly stated at an open meeting and recorded in the official minutes, shall not be subject to criminal penalties, unless the solicitor rendered the opinion under duress or as a result of collusion with the public official to violate the Act. Section 1109(g) of the Act, 65 Pa.C.S. § 1109(g).

10. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law and whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

phasis added). Section 2399.16(c)(3) of the Third Class County Convention Center Authority Act[11] also states that certain individuals shall not enter into a contract valued at $500 or more "unless the contract has been awarded **to the lowest responsible bidder** through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded." 16 P.S. § 2399.16(c)(3) (emphasis added). The fact that the phrase "to the lowest responsible bidder" does **not** appear in section 1103(f) of the Act indicates that the "open and public process" requirement in that provision may be satisfied without competitive bidding.

Moreover, interpreting the words "open and public process" in section 1103(f) of the Act to mean a competitive bidding process would lead to absurd and unreasonable results.[12] In this regard, we note that, under section 511 of the Commonwealth Procurement Code, (the Procurement Code), there are exceptions to the general rule that "all Commonwealth agency contracts shall be awarded by competitive bidding." 62 Pa.C.S. § 511.

For example, a contract may be awarded without competition if it is determined that only a single contractor is capable of providing the supply, service or construction.[13] Section 515(1) of the Procurement Code, 62 Pa.C.S. § 515(1). If we were to interpret "open and public process" in section 1103(f) of the Act to mean only a competitive bidding process, then it would be a violation of the provision for a public official who is the only contractor capable of providing a service to enter into a contract for that service.

Similarly, section 516 of the Procurement Code allows an agency to make an emergency procurement when there is a threat to the public health, welfare or safety, or when circumstances outside the control of the agency create an urgency of need that does not permit formal competitive bidding. 62 Pa.C.S. § 516. If we were to interpret "open and public process" in section 1103(f) of the Act to mean only a competitive bidding process, then it would be a violation of the provision for a public official with the means to avert a threat to public health, welfare or safety, or satisfy an urgent need, to enter into a contract to address the emergency.

It is absurd and unreasonable to find a public official in violation of the Act for entering into a contract for a service that only he can provide or for a service that is needed in an emergency. Thus, we conclude that the Commission erred in construing the words "open and public process" in section 1103(f) of the Act to mean only a competitive bidding process. Because of the Commission's legal error, the Commission failed to prove by clear and convincing evidence that the contracts in this case were not awarded through an "open and public process."[14]

---

**11.** Act of August 9, 1955, P.L. 323, added by section 3 of the act of November 3, 1999, P.L. 461, 16 P.S. § 2399.16(c)(3).

**12.** In ascertaining the intention of the General Assembly in the enactment of a statute, we presume that the General Assembly does not intend a result that is absurd or unreasonable. Section 1922(1) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(1).

**13.** We note that Keegan testified with respect to the Transportation Facility that "there was

no other property or facility to meet the CLIU's needs." (Commission's op. at 67.)

**14.** The evidence shows that there were public meetings with discussions about the intention to build the facilities and to enter into contracts with Roth, that the meetings were advertised and that the agendas were distributed to the media. (Commission's op. at 79.) Moreover, there is no evidence suggesting that the proposals considered and the con-

## B. LLAS Vote

Kistler also argues that the Commission erred in concluding that he violated section 1103(a) of the Act by voting on June 17, 2002, to authorize Roth to pursue the construction of the LLAS facility. We agree.

Under section 1103(a) of the Act, no public official shall engage in conduct that constitutes a conflict of interest. "Conflict of interest" is defined, in pertinent part, as follows:

> Use by a public official ... of the authority of his office ... or any confidential information received through his holding public office ... for the private pecuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated.

Section 1102 of the Act, 65 Pa.C.S. § 1102.

Initially, we set forth in a timeline the sequence of events showing the overlap between Kistler's involvement in the Transportation Facility and his vote on the LLAS facility project.

> March 18, 2002—At the Board meeting, Kistler resigned from the building committee because of his possible involvement in the construction of the Transportation Facility. Kistler abstained from a vote to make a Roth firm the Board's agent in pursuing a lease-purchase agreement for the Transportation Facility property, but Kistler voted to authorize a company to study a mold problem at the LLAS facility on property that the Board leases.
>
> May 2, 2002—Roth gave Kistler an initial commitment to use a Kistler company to build the Transportation Facility.
>
> May 15, 2002—The Board received the findings and recommendations of the company conducting the study of the mold problem at the LLAS facility.
>
> May 28, 2002—Roth faxed Kistler a memo containing the color sequences for the Transportation Facility's roof, gutters, downspouts and sidewalk panels.
>
> **June 17, 2002**—At the Board meeting, Kistler voted to terminate the LLAS facility lease. On a separate motion, **Kistler voted to authorize Roth to pursue construction of a new LLAS facility,** having no idea that he would be involved in that construction.
>
> June 29, 2002 (approximately)—Roth made a definite commitment to Kistler for the Transportation Facility building.
>
> July 12, 2002—Roth and Kistler executed an agreement for the Transportation Facility.
>
> July 15, 2002—At the Board meeting, the Board approved the agreement for the Transportation Facility, and Kistler abstained.

(Commission's Findings of Fact, Nos. 25–26, 31–34, 50–53; Commission's op. at 66–68, 74.)

The timeline shows that, once Kistler realized that he might be involved in the construction of the Transportation Facility, he resigned from the building committee and abstained from every vote on the Transportation Facility. The LLAS facility was a completely different matter. Because of a mold problem, the Board voted on June 17, 2002, to terminate its lease for the LLAS facility. Having done so, the Board needed to find another location for the LLAS facility. Someone, not Kistler, moved to authorize Roth to pursue the matter. Kistler voted in favor of the motion in order to remedy the situation caused by the mold problem, not in order to give business to Roth so that Roth

tracts awarded were not subsequently disclosed to the public.

would make a final commitment to Kistler for the Transportation Facility contract.

Indeed, the Commission found that Kistler **unintentionally** used his LLAS vote to obtain the Transportation Facility contract with Roth. However, because Kistler **did not intend** there to be any connection between his LLAS vote and the Transportation Facility contract with Roth, one cannot logically say that Kistler "used" his vote to obtain that contract. Thus, we conclude that when Kistler cast his LLAS vote on June 17, 2002, he did not violate section 1103(a) of the Act.[15]

Accordingly, we reverse.

Judge BUTLER concurs in the result only.

### ORDER

AND NOW, this 17th day of October, 2008, the order of the State Ethics Commission, dated June 29, 2007, is reversed.

### DISSENTING OPINION BY Judge COHN JUBELIRER.

Because I believe that the Commission properly concluded that Kistler violated subsections (a) and (f) of Section 1103 of the Public Official and Employee Ethics Act (Act),[1] I respectfully dissent from the majority opinion.

The Commission concluded that Kistler unintentionally violated Section 1103(a) of

the Act on June 17, 2002, by voting to authorize Roth to pursue construction of the LLAS Facility while he was engaged in seeking a subcontract with Roth and/or Cornerstone R.E., LLC, to construct a pole building for the Transportation Facility "and had a reasonable expectation that he would receive such" subcontract. (Commission Final Adjudication (Adjudication), Conclusions of Law (COL) ¶ 5.) According to the majority, however, "because Kistler *did not intend* there to be any connection between his LLAS vote and the Transportation Facility contract with Roth ... Kistler did not violate Section 1103(a) of the Act." *Kistler v. State Ethics Commission,* 958 A.2d 1092, 1100 (Pa.Cmwlth. 2007) (emphasis in original).

I disagree that Kistler had to intend there to be a connection between his LLAS vote and the Transportation Facility contract with Roth in order to violate Section 1103(a) of the Act. Section 1103(a) of the Act provides that "[n]o public official ... shall engage in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). Section 1102 of the Act defines "conflict of interest" as:

> [u]se by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pe-

---

**15.** In concluding otherwise, the Commission relied on *Snyder v. State Ethics Commission,* 686 A.2d 843 (Pa.Cmwlth.1996), in which a township supervisor voted on two projects while actively engaged in business relationships with respect to those projects. That is not the situation here. Once Kistler became involved with Roth on the LLAS project, he cast no more votes on that project.

The Commission also relied on *Yocabet v. State Ethics Commission,* 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987), in which this court held that a public official violated the conflict

of interest provision of the Act, even though he did not intend to do so, where he voted to appoint himself secretary/treasurer of the township and receive compensation for the position that was not set in accordance with law. In other words, the public official's vote led directly to illegal financial gain. However, as indicated above, in this case, there is no evidence that Kistler's vote on the LLAS facility led directly to the Transportation Facility contract.

**1.** 65 Pa.C.S. § 1103(a), (f).

cuniary benefit of himself, a member of his immediate family or a business with which he or a member of his immediate family is associated.

65 Pa.C.S. § 1102.

This Court previously addressed the issue of whether intent is required in order to find a violation of the Act in *Yocabet v. State Ethics Commission*, 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987). In that case, the Commission determined that Yocabet violated Section 3(a) of the former version of the Act[2] by participating in his appointment as secretary/treasurer for Luzerne Township and then receiving compensation for that office which was not set by Luzerne Township's auditors as required by law. *Id.* at 538. On appeal to this Court, Yocabet argued that he could not have violated Section 3(a) because he did not intend to use his office to obtain financial gain. *Id.* at 539. This Court ultimately concluded that the Commission was correct in finding that Yocabet had violated Section 3(a), even if he lacked the intent to do so. *Id.*

We expanded upon our discussion of the intent issue in *McGuire v. State Ethics Commission*, 657 A.2d 1346 (Pa.Cmwlth. 1995). In that case, the Commission determined that McGuire and another individual, Marchitello, had violated Section 3(a) of the former version of the Act by receiving excess compensation for serving as board members and officers of the North Versailles Township Sanitary Authority. *Id.* at 1348–50. On appeal to this Court, McGuire and Marchitello argued that the Commission erred because a violation of Section 3(a) requires more than

mere passive and unknowing acceptance of excessive compensation. *Id.* at 1350–51. The Commission countered by arguing that: based on this Court's decision in *Yocabet*, intent is not required to find a violation of Section 3(a); and an employee's acceptance of excess compensation is not passive. *Id.* at 1351. This Court responded as follows:

> While *Yacobet* [sic] does not require intent in order to find a violation of Section 3(a) of the Ethics Act has occurred, it does not mean that a public official does not have to take action to fall within that section's prohibition. Section 3(a) of the Ethics Act requires that a public official "use" his public office to obtain financial gain. "Use", however, is not defined. The [Commission]'s belief that mere acceptance of a check constitutes "use" of a public office reaches beyond the limits of the normal interpretation of that term in the context provided. "Use" of public office requires action by a public official that in some way facilitates his receipt of compensation to which he is not entitled, such as in *Yacobet* [sic] where the individual voted to increase his own salary without having authority to do so. Mere mistaken acceptance by a public official of a compensation check in an amount that was determined prior to his term in office is devoid of the type of action needed to constitute "use" of office for the purpose of obtaining personal financial gain.

*Id.* at 1351–52. Thus, based on my reading of the Act, as well as our precedent, I

**2.** Act of October 4, 1978, P.L. 883, formerly 65 P.S. § 403(a), amended by the Act of June 26, 1989, P.L. 26, repealed by the Act of October 15, 1998, P.L. 729. Section 3(a) of the former version of the Act provided:

No public official or public employee shall use his public office or any confidential information received through his holding public office to obtain financial gain other than compensation provided by law for himself, a member of his immediate family, or a business with which he is associated.

believe that a public official may violate Section 1103(a) of the Act, even if he lacks the intent to do so; the public official need only take some action related to his public office which results in a private pecuniary benefit to himself, a member of his immediate family, or a business with which he or a member of his family is associated.

In the present case, Roth gave Kistler an initial commitment, on May 2, 2002, to use Kistler Pole Building Company for the construction of the Transportation Facility. Kistler subsequently voted, on June 17, 2002, to authorize Roth to pursue construction of the LLAS Facility. Just 12 days later, on June 29, 2002, Roth made a definite commitment to Kistler to use Kistler Pole Building Company for the construction of the Transportation Facility. Even though Kistler may not have intended such a result, it appears that Kistler Pole Building Company received the subcontract from Roth to construct the Transportation Facility as a result of Kistler's actions in voting to authorize Roth to pursue construction of the LLAS Facility. I believe that this is precisely the type of situation that, if left unchecked, will cause the public to distrust and lose confidence in their government officials, which is what the Act ultimately seeks to prevent. See Section 1101.1(a) of the Act, 65 Pa.C.S. § 1101.1(a).[3] Given Kistler's ongoing personal business dealings with Roth, Kistler should have abstained from participating in the vote for Roth to pursue construction of the LLAS Facility. See Snyder v. State Ethics Commission, 686 A.2d 843, 849 (Pa. Cmwlth.1996) (concluding that the appellant "should not have considered and voted on issues involving his personal business dealings").[4] Because I believe that Kistler's failure to do so constituted a conflict of interest in violation of Section 1103(a) of the Act, I would affirm the Commission's determination in this regard.[5]

3. Section 1101.1(a) of the Act provides, in relevant part, that:

The Legislature hereby declares that public office is a public trust and that any effort to realize personal financial gain through public office other than compensation provided by law is a violation of that trust. In order to strengthen the faith and confidence of the people of this Commonwealth in their government, the Legislature further declares that the people have a right to be assured that the financial interests of holders of or nominees or candidates for public office do not conflict with the public trust. 65 Pa.C.S. § 1101.1(a).

4. According to the majority, Snyder is inapplicable to the present case because it involved a situation where a township supervisor voted on two projects while he was actively engaged in business relationships with respect to those projects, and here Kistler abstained from voting once he became involved with the LLAS Facility. Kistler, op. at 1100 n. 15. However, I disagree that Snyder is inapplicable. There is no reason why this Court should require a public official to abstain from voting on projects while he is actively engaged in business relationships with respect to those projects, and not also require abstention in situations, such as this one, where a public official who has an ongoing business relationship with a company as to one project votes to use that same company for a second project. Clearly, in this latter situation, the public official can still be said to have "used" his office to obtain a private pecuniary benefit, even though the "use" of office and the private pecuniary benefit may span across two different projects. The reasons for this become even more obvious where, as here, the public official also later receives a pecuniary benefit by entering into a subcontract for the second project.

5. Although the Commission found that Kistler's violation of Section 1103(a) of the Act was unintentional and, thus, did not impose any sanctions, this does not alter the fact that a violation of Section 1103(a) occurred. By finding that Kistler did not intentionally violate Section 1103(a), the Commission excused Kistler for his past conduct which he did not understand to be improper, but, at the same time, put Kistler, as well as other public officials, on notice that the conduct in which Kistler engaged is prohibited and will not be tolerated in the future.

The Commission also concluded that, because the Carbon–Lehigh Intermediate Unit (CLIU) did not award the contracts for the Transportation Facility and the LLAS Facility to Roth through an open and public process, which included competitive bidding, Kistler violated Section 1103(f) of the Act by entering into subcontracts with Roth to construct those facilities. (Adjudication COL ¶¶ 7–8.) According to the majority, the Commission erred in interpreting Section 1103(f) as requiring competitive bidding because it does not contain the language, "to the lowest responsible bidder," which is normally used by the General Assembly when it seeks to require competitive bidding. *Kistler*, op. at 1097–98. The majority also opines that the Commission's interpretation of Section 1103(f) of the Act would lead to absurd and unreasonable results because it conflicts with Sections 515(1) and 516 of the Commonwealth Procurement Code (Procurement Code), 62 Pa.C.S. §§ 515(1) and 516, which create exceptions to the general rule requiring competitive bidding for all Commonwealth agency contracts. *Kistler*, op. at 1098.

Again, I respectfully disagree with the majority opinion. Section 1103(f) of the Act provides that:

No public official . . . or any business in which the person . . . is associated shall enter into any contract valued at $500 or more with the governmental body with which the public official . . . is associated or any subcontract valued at $500 or more with any person who has been awarded a contract with the governmental body with which the public official . . . is associated, unless the contract has been awarded through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded.

65 Pa.C.S. § 1103(f). Although Section 1103(f) of the Act does not contain the language "to the lowest responsible bidder," which is often present in other statutes, I believe that interpreting Section 1103(f) to not require competitive bidding is inconsistent with the purpose behind the Act, which is to promote public trust in government. I believe that, in order to be consistent with the purpose of the Act, the phrase "open and public process" used in Section 1103(f) of the Act must be interpreted to require more than merely holding discussions at public meetings about the intent to build a facility or enter into a contract with a particular contractor, distributing notice of such meetings to the public, and distributing agendas to the media. Instead, there must be a meaningful opportunity for competitors to submit bid proposals following the solicitation of such bid proposals through publicly distributed notices or advertisements of the available contracts. This competitive bidding process serves as a safeguard to ensure that public officials are awarding contracts to benefit the public which they serve, rather than to benefit their own interests and personal dealings.

Moreover, while the majority believes that interpreting Section 1103(f) of the Act to require competitive bidding would conflict with Sections 515(1) and 516 of the Procurement Code, I disagree. In this regard, I initially point out that the Procurement Code is not implicated in this case because the CLIU is not a Commonwealth agency. *See* Section 103 of the Code, 62 Pa.C.S. § 103; [6] *see also* 22 Pa.

**6.** The Code defines a "Commonwealth agency" as "[a]n executive agency, an independent agency or a State-affiliated entity." 62 Pa.

C.S. § 103. "Executive agency" is defined as "[t]he Governor and the departments, boards, commissions, authorities and other officers

Code § 4.3 (defining an "[i]ntermediate unit" as "[a] regional educational service agency ... which provides educational services to participating school districts as part of the public school system of this Commonwealth"). Further, even if the Procurement Code were implicated, there is no reason why interpreting Section 1103(f) of the Act to generally require competitive bidding would cause the exceptions created by Sections 515(1) and 516 of the Procurement Code to lose their current effect. In fact, I believe that interpreting Section 1103(f) of the Act to generally require competitive bidding would be more consistent with the requirements of the Procurement Code.

Here, the CLIU awarded the general contracts for the Transportation Facility and the LLAS Facility to Roth without soliciting bid proposals from competitors through publicly distributed notices or advertisements of the available contracts. (Adjudication, Findings of Fact ¶¶ 44, 64.) This did not satisfy the "open and public process" requirement of Section 1103(f). Because the general contracts for the Transportation Facility and the LLAS Facility were not awarded to Roth through an open and public process that included

competitive bidding, I believe that Kistler violated Section 1103(f) of the Act when he entered into subcontracts with Roth, which were valued at more than $500, to construct pole buildings for those facilities. Therefore, I would also affirm the Commission's determination as to the violation of Section 1103(f) of the Act.

For the foregoing reasons, I respectfully dissent.

and agencies of the Commonwealth. The term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies or any independent agency or State-affiliated entity." 62 Pa.C.S. § 103. "Independent agency" is defined as:

Boards, commissions and other agencies and officers of the Commonwealth which are not subject to the policy supervision and control of the Governor. The term does not include any State-affiliated entity, any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, any State-related institution, political subdivision or any local, regional or metropolitan transportation authority.

62 Pa.C.S. § 103. "State-affiliated entity" is defined as:

A Commonwealth authority or a Commonwealth entity. The term includes the Pennsylvania Turnpike Commission, the Pennsylvania Housing Finance Agency, the Pennsylvania Municipal Retirement System, the Pennsylvania Infrastructure Investment Authority, the State Public School Building Authority, the Pennsylvania Higher Educational Facilities Authority and the State System of Higher Education. The term does not include any court or other officer or agency of the unified judicial system, the General Assembly and its officers and agencies, any State-related institution, political subdivision or any local, regional or metropolitan transportation authority.

62 Pa.C.S. § 103.