710 A.2d 1083

COMMONWEALTH of Pennsylvania, Appellee,

v.

Yashpaul S. PARMAR, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 29, 1997.

Decided Feb. 26, 1998.

Lee G. Nollau, State College, for Yashpaul S. Parmar.

Jerome T. Foerster, Thomas W. Corbett, Jr., William V. Conley, Robert A. Graci, Harrisburg, for Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

320

## ORDER

PER CURIAM.

The Court being evenly divided, the order of the Superior Court is affirmed.

NEWMAN, J., files an Opinion in Support of Affirmance in which FLAHERTY, C.J., and CASTILLE, J., join.

ZAPPALA, J., files an Opinion in Support of Reversal in which CAPPY, J., joins.

NIGRO, J., files an Opinion in Support of Reversal.

## OPINION IN SUPPORT OF AFFIRMANCE

ZAPPALA, Justice.

Yashpaul Parmar (Parmar) appeals the Order of the Superior Court that reinstated his judgment of sentence for bribery by violating a known legal duty [1] and conspiracy to commit bribery.[2] We affirm.

## FACTS

The evidence elicited at trial established that Parmar was a civil engineer for the Pennsylvania Department of Transportation (PennDOT) from September 10, 1968 to May 7, 1993. In September of 1990, Parmar was a district plans engineer for the PennDOT office in Clearfield, Pennsylvania. He was responsible for the design of highway projects and for reviewing contract documents for large construction enterprises on state highways within nine counties. Additionally, Parmar was one of several engineers who reviewed highway occupancy permits (HOPs) for proposed construction sites along state highways.

In 1990, the PennDOT procedure for approval of a HOP was for a company to submit an application for a HOP and plans for the proposed construction site. A PennDOT supervisor would attach a routing slip to the application packet and then

**1.** 18 Pa.C.S. § 4701(a)(3).

**2.** 18 Pa.C.S. § 903(a).

circulate the application packet to a plans engineer and a traffic engineer for review. As a plans engineer, Parmar's primary responsibility, unless a supervisor directed him on the routing slip to perform special reviews, was to consider whether the plan provided for appropriate water drainage from the proposed construction site. If, after reviewing the plans, Parmar determined that any surface water from the proposed development was improperly diverted into PennDOT's drainage system, the developer would be required to prepare or revise a drainage control plan. If Parmar found that the drainage of water off the site was appropriate, then no drainage control plan would be required, and Parmar could approve the plans. Following Parmar's assessment of the submitted plans, he would send the application to the traffic engineer, who would review the plans. He would then either return them to the construction company for redrafting, or approve them and the PennDOT supervisor would issue the HOP.

On September 5, 1990, Parmar's supervisor directed him to evaluate a HOP that Sheetz, Inc. (Sheetz) had submitted to PennDOT. The HOP related to a service station that Sheetz was converting into a convenience store in Wingate, Pennsylvania. The new convenience store was scheduled to open in late September of 1990 and Sheetz had requested an expedited review of the permit.[3]

The next day, Parmar went to the site of the new Sheetz store and met with the construction superintendent, Joseph Pastorelli. After observing the site, Parmar concluded that there would be no water runoff from the project so Sheetz did not have to submit a drainage control plan. However, Parmar informed Pastorelli that, based on his twenty-five years with PennDOT, the plans did not comply with PennDOT's traffic regulations. For example, he stated that there was no estimate of daily traffic volume on the site and the driveway design was improper because it was too close to an intersection and the curb designs were improper because there was no

3. The testimony at trial established that expedited review is a standard procedure at PennDOT as part of its service and there is no additional cost to applicants or PennDOT for the service.

concrete barrier curbing. Parmar told Pastorelli that, in his opinion, Sheetz would have to rectify those traffic flow deficiencies before the traffic engineer would approve the plans and PennDOT would issue the HOP.

While Parmar was present, Pastorelli called the headquarters of Sheetz to explain that changes had to be made to the plans for the site. Sheetz personnel informed Pastorelli that it could take as long a time as a month to prepare and submit revised plans, and the store's opening could be delayed. Parmar offered to perform the requisite revisions and "walk the application through the approval process" for approximately $5,000. Sheetz ultimately agreed to pay Parmar $3,500 for his services.

However, PennDOT's written work rules require employees to obtain prior departmental approval of supplemental employment, which is a term that PennDOT uses to describe a state employee's paid work for another employer done outside of his or her PennDOT job. Parmar did not obtain prior approval of his work for Sheetz and he was aware that performing supplemental employment without prior approval was a violation of PennDOT's work rules.

Nevertheless, Parmar revised Sheetz's plans so they would comply with PennDOT's traffic regulations. Parmar wrote on a routing slip that accompanied the plans that the application was acceptable to him as plans engineer and he recommended that PennDOT should issue a HOP on September 17, 1990. He sent the plans, with his changes, within the PennDOT office to the traffic engineer, who also approved the application. Thus, PennDOT issued the HOP to Sheetz in time for the scheduled grand opening of the store on September 30, 1990.

Parmar requested that Sheetz pay him in cash for his work, but Sheetz would only pay him by check after he submitted an invoice for his services. At that time, Parmar instructed his daughter to prepare an invoice in the name of her roommate, Dianne Carson, a waitress who had no knowledge of civil engineering. After Sheetz received the invoice, they sent a

check made payable to Carson for $3,500.00. Parmar, his daughter and Carson went to the bank to cash the check made payable to Carson. Because Carson did not have sufficient funds in her account to cover the check, the bank required her to deposit the check. The next day, Carson, Parmar and Parmar's daughter went back to the bank and Carson withdrew the funds and gave them to Parmar.

## PROCEDURAL HISTORY

The state inspector general's office discovered Parmar's involvement in this arrangement. The police arrested him and, on October 5, 1993, the Commonwealth filed an information charging Parmar with bribery by consideration for exercise of discretion as public servant, 18 Pa.C.S. § 4701(a)(1), bribery for violation of a known legal duty, 18 Pa.C.S. § 4701(a)(3), and conspiracy to commit forgery and bribery, 18 Pa.C.S. § 903. The Commonwealth proceeded on the following two theories pursuant to the bribery statute: (1) that Sheetz paid Parmar to gain his approval of the HOP in violation of Section 4701(a)(1); and (2) Parmar deliberately violated a known legal duty to, for example, report supplemental employment to PennDOT, in violation of Section 4701(a)(3).

After a trial in the Court of Common Pleas of Centre County (trial court), a jury convicted Parmar of one count of bribery for violating a known legal duty, which was, for example, his failure to report supplemental income and one count of conspiracy to commit bribery for involving his daughter and her friend in the payment. The trial court sentenced Parmar to twenty-four months of probation and a $1,000 fine.

Parmar filed Post–Sentence Motions, including a Motion for Judgment of Acquittal. He argued that his convictions were improper because he should have been prosecuted, instead of pursuant to the Crimes Code statute governing bribery in official and political matters, pursuant to the more specific statutory offenses defined in the Act of October 4, 1978, P.L. 883, *as amended,* 65 P.S. §§ 401–413, commonly referred to as the State Ethics Act (SEA), which prohibits any conduct that

would cause a conflict of interest between the state employee's personal and professional interests, and the State Adverse Interest Act (SAIA), Act of July 19, 1957, P.L. 1017, 71 P.S. § 776.1 *et seq.*, which prohibits a state employee from having an adverse interest in a state contract. Parmar argued that prosecution pursuant to the above-mentioned statutes should have been pursued instead of the Crimes Code statute governing bribery in official and political matters. The trial court agreed and arrested judgment on Parmar's convictions and held that the Commonwealth should have prosecuted Parmar pursuant to SEA and SAIA, the more specific statutes. The Commonwealth filed a timely appeal.

The Superior Court reversed the trial court's judgment of acquittal and reinstated the judgment of sentence in *Commonwealth v. Parmar*, 448 Pa.Super. 470, 672 A.2d 314 (1996). Parmar filed a timely Petition for Allowance of Appeal.

We granted Parmar's Petition for Allowance of Appeal to consider whether the Commonwealth committed error in prosecuting him pursuant to the general Crimes Code statute, bribery in official and political matters, instead of the more specific statutory crimes, SEA and SAIA.

## DISCUSSION: WARNER ANALYSIS

Section 1933 of the Statutory Construction Act, 1 Pa.C.S. § 1933, sets forth the following instruction concerning statutes that govern similar subject matter:

§ 1933. Particular controls generally

Whenever a general provision in a statute shall be in conflict with a special provision in the same or another statute, the two shall be construed, if possible, so that effect may be given to both. If the conflict between the two provisions is irreconcilable, the special provisions shall prevail and shall be construed as an exception to the general provision, unless the general provision shall be enacted later and it shall be the manifest intention of the General Assembly that such general provision shall prevail.

1 Pa.C.S. § 1933. Two statutes conflict when the same facts which would constitute one offense, also constitute another offense. *Commonwealth v. Brown,* 346 Pa. 192, 29 A.2d 793 (1943).

We applied and refined this rule in *Commonwealth v. Warner,* 504 Pa. 600, 476 A.2d 341 (1984). In *Warner,* the Commonwealth charged the defendant with a general offense, theft by deception,[4] and a specific offense, welfare fraud.[5] The defendant filed a pre-trial motion to dismiss the general theft charge because it prohibited the identical activity as the welfare fraud statute. The trial court agreed and held that the Commonwealth could only prosecute Warner pursuant to the specific statute and the Superior Court affirmed.

We examined the two statutes in *Warner* and concluded that, depending on the specific facts of the case, the statutes could be interpreted as either governing the same behavior or not. Thus, we held that any actual conflict between the two statutes could only be established after the facts of the case are fully developed at trial. At the conclusion of the case, a court could properly determine if the general statute had an additional element in comparison with the specific statute so as to give effect to both or to eliminate the charge pursuant to the more general offense. *Id.*

We will apply the *Warner* analysis here to determine whether the Commonwealth committed error in prosecuting Parmar pursuant to the general statute in the Crimes Code, bribery in official and political matters, instead of the more specific statutory crimes set forth in SEA and SAIA. We begin with an analysis of whether Section 4701 irreconcilably conflicts with either SEA or SAIA by prohibiting the same conduct. The General Assembly recodified the general bribery statute, 18 Pa.C.S. § 4701 to prohibit bribery in official and political matters.[6] Section 4701 states the following:

**4.** 18 Pa.C.S. § 3922(a).

**5.** 62 P.S. § 481(a).

**6.** Former Pennsylvania law included several offenses within the "generic category of bribery," including common law bribery, corrupt solicita-

## § 4701. BRIBERY IN OFFICIAL AND POLITICAL MATTERS

(a) Offenses defined.—A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another:

 (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or their exercise of discretion as a public servant, party official or voter by the recipient;

 . . . .

 (3) any benefit as consideration for a *violation of a known legal duty* [7] as public servant or party official.

18 Pa.C.S. § 4701 (emphasis added).

The General Assembly enacted SAIA in 1957, to strengthen public confidence in the integrity of State employees by prohibiting advisors, consultants, officers and employees of the Commonwealth from having adverse interests in certain contracts and circumstances. *See* 71 P.S. § 776.1. The specific sections of SAIA pertinent in this case provide as follows:

No State advisor or State consultant having recommended to the State agency which he serves, either the making of a contract or a course of action of which the making of a contract is an express or implied part, shall, at any time thereafter, have an adverse interest in such contract.

tion and the practice of solicitation, which were all included in Section 4701 when the legislature recodified the statute. *United States v. Forsythe,* 560 F.2d 1127, 1137 (3d Cir.1977).

7. The American Law Institute Comment 8 to the Model Penal Code Section 240.0 (1980), regarding a public servant's bribery by violating a known legal duty, states, "[t]he phrase 'legal duty' . . . is intended to be interpreted broadly to apply to any specific and clearly delineated obligation of a public servant. . . . Possible sources of such a duty include the state constitution, statutes, administrative regulations, executive orders, and developed traditions concerning performance of official functions. The breadth of this concept is limited by the requirement that the duty exist at law and . . . that the actor know of the duty and that the contemplated action would constitute a violation of it."

No State employe shall influence, or attempt to influence, the making of or supervise or in any manner deal with any contract in which he has an adverse interest.

*No State employe shall have an adverse interest in any contract with the State agency by which he is employed.*

. . . .

*No State employe, except in the performance of his duties as such employe, shall, for remuneration, directly or indirectly, represent any other person upon any matter pending before or involving any State agency.*

71 P.S. §§ 776.4–776.7 (emphasis added). SAIA defines an adverse interest as being a party to a contract, or being a stockholder, partner, member, agent, representative or employe of such a party. 71 P.S. § 776.2. A contract is defined as "an arrangement for the acquisition, use or disposal by a State agency of services or of supplies, materials, equipment, land or other personal property." 71 P.S. § 776.2.

Similarly, the General Assembly enacted SEA in 1978, to "strengthen the faith and confidence of the people of the State in their government" by declaring that "public office is a public trust" and that any attempt by a public officer or employee to realize personal financial gain through a public office is a violation of the public trust. 65 P.S. § 401. SEA provides in relevant part as follows:

§ 403. Restricted activities.

(a) No public official or public employee shall engage in conduct that constitutes a conflict of interest.

(b) No person shall offer or give to a public official, public employee . . . anything of monetary value . . . based on the offeror's or donor's understanding that the vote, official action or judgment of the public official or public employee or nominee or candidate for public office would be influenced thereby.

(c) No public official, public employee . . . shall solicit or accept, anything of monetary value . . . based on any understanding of that public official, public employee or nominee that the vote, official action, or judgment of the official,

public employee or nominee or candidate for public office would be influenced thereby.

65 P.S. § 403.[8] SEA defines a conflict of interest as

[u]se by a public official or public employee of the authority of this office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself. . . .

65 P.S. § 402.

Parmar argues that these three statutes prohibit the same behavior and therefore conflict; we disagree. Where the provisions of two statutes are in conflict, but the conflict is not irreconcilable, they shall be construed to give effect to both statutes. 1 Pa.C.S. § 1933; *Warner.* To determine whether the conflict between these statutes is irreconcilable, we must apply the *Warner* rule, which states that when two statutes have identical elements such that the general statute wholly subsumes the specific statute, but the general statute contains an additional element when compared with the specific statute, then the Commonwealth may properly prosecute a defendant pursuant to the more general statute. *Warner.* Here, we must consider whether bribery has an additional element when compared with SEA and SAIA within the facts of this case as established at trial.

We hold that the Commonwealth had to prove additional elements to convict Parmar under the bribery statute when compared with both SEA and SAIA; therefore, the Commonwealth did not violate the *Warner* rule. Here, the jury found Parmar guilty of violating Section 4701(a)(3) of the bribery statute, bribery by violation of a known legal duty, which requires proof that a state employee intentionally, knowingly or recklessly violated a known legal duty. 18 Pa.C.S. § 4701.

**8.** SEA defines "public employee" as an individual employed by the Commonwealth or a political subdivision who is responsible for taking or recommending official action of a nonministerial nature with regard to, contracting or procurement, administering or monitoring grants or subsidies, planning or zoning, inspecting, licensing, regulating or auditing any person or any other activity where the official action has an impact of greater than a *de minimis* nature on the interests of any person. 65 P.S. § 402.

SEA does not require that the Commonwealth prove the state employee's adverse interest violated a known legal duty. Likewise, SAIA does not require proof that the employee knew that having an adverse interest in a state contract violated a known legal duty. Consequently, the general Crimes Code statute in this case required proof of an additional element when compared with the specific statutory offenses SEA and SAIA, and the Commonwealth did not violate the *Warner* rule in prosecuting Parmar.

We therefore agree with the Superior Court that the trial court erred in arresting judgment and that the judgment of sentence should be reinstated. We reach this conclusion, however, based on grounds different from the Superior Court. *E.J. McAleer and Co., Inc. v. Iceland Products, Inc.*, 475 Pa. 610, 381 A.2d 441 (1977)(this Court may affirm decision below on other grounds). The Superior Court held that bribery contains an additional element of culpability that is not found in SAIA or SEA. We disagree with the Superior Court's conclusion that SAIA and SEA are not subject to culpability requirements, and thus address the question of whether SAIA and SEA impose absolute criminal liability.

## *MENS REA* ANALYSIS

 The bribery statute does not have an explicit *mens rea* requirement on its face, but it is subject to the culpability requirements of Section 302 of the Crimes Code;

§ 302. General requirements of culpability

(a) Except as provided in section 305 of this title (relating to limitations on scope of culpability requirements), a person is not guilty of an offense unless he acted intentionally, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense.

. . . .

(c) Culpability required unless otherwise provided.—When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is

established if a person acts intentionally, knowingly or recklessly with respect thereto.

18 Pa.C.S. § 302. Thus, bribery is established if a person acts intentionally, knowingly, recklessly or negligently with respect to each material element of the offense.

The Superior Court concluded that SAIA and SEA, unlike bribery, satisfy an exception to the culpability requirements of Section 302(a) of the Crimes Code. The culpability requirements of Section 302 apply to all crimes in the Crimes Code, like bribery, and those outside of the Crimes Code, like SAIA and SEA. However, the General Assembly provides limitations to the culpability requirements of Section 302(a) in Section 305(a) as follows:

§ 305. Limitations on scope of culpability requirements

(a) When culpability requirements are inapplicable to summary offenses and to offenses defined by other statutes.—The requirements of culpability prescribed by section 301 of this title (relating to requirement of voluntary act) and section 302 of this title (relating to general requirements of culpability) do not apply to:

(1) summary offenses, unless the requirement involved is included in the definition of the offense or the court determines that its application is consistent with effective enforcement of the law defining the offense; or

(2) offenses defined by statutes other than this title, in so far as *a legislative purpose to impose absolute liability* for such offenses or with respect to any material element thereof *plainly appears*.

18 Pa.C.S. § 305 (emphasis added). When the General Assembly plainly indicates a legislative purpose to impose absolute liability, pursuant to Section 305(a)(2), the Commonwealth does not have to establish a *mens rea* element to establish the defendant is guilty of a crime. The Commonwealth argues that SEA and SAIA plainly impose absolute criminal liability and pursuant to Section 305(a)(2) are not, therefore, subject to the culpability requirements of 302(a). We disagree.

No intent plainly appears to impose absolute liability in either SEA or SAIA. The omission of an explicit *mens rea* element in a criminal statute is not alone sufficient evidence of the legislature's plain intent to dispense with a traditional *mens rea* requirement and impose absolute criminal liability. *Morissette v. U.S.*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).[9] In the absence of plain legislative intent, we must consider the purpose for the two statutes, the severity of punishment and its effect on the defendant's reputation and, finally, the common law origin of the crimes to determine whether the legislature intended to impose absolute criminal liability. *See Staples v. United States*, 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994); *Commonwealth v. Mikulan*, 504 Pa. 244, 470 A.2d 1339 (1983) (Zappala, J., concurring) (quoting *Holdridge v. United States*, 282 F.2d 302 (8th Cir.1960)).

Absolute criminal liability statutes are an exception to the centuries old philosophy of criminal law that imposed criminal responsibility only for an "act coupled with moral culpability." *Commonwealth v. Weinstein*, 499 Pa. 106, 116, 451 A.2d 1344, 1348 (1982). A criminal statute that imposes absolute liability typically involves regulation of traffic or liquor laws. *E.g., Commonwealth v. Mikulan*, 504 Pa. 244, 470 A.2d 1339 (1983) (upholding the imposition of absolute criminal liability where the Commonwealth failed to charge or prove culpability pursu-

**9.** In *Morissette*, the Supreme Court of the United States heard the appeal of a criminal defendant convicted of stealing scrap metal from U.S. government property in violation of 18 U.S.C. § 641, which prohibits the knowing conversion of government property. Morissette alleged that he believed the metal was cast-off and abandoned and therefore asserted that he did not possess the requisite *mens rea* for the offense. The U.S. government asserted that this particular offense required no element of criminal intent because Congress had failed to express such a requirement on the face of the statute. The trial court agreed.

Following affirmance of his conviction on appeal, the Supreme Court of the United States reversed Morissette's conviction. *Morissette*. It held that Section 641 was derived from the common law crime of stealing/larceny. *Id.* As such, and absent a plain legislative intent to the contrary, this statute was subject to the rule at common law that scienter is a necessary element of every crime. *Id.* It held, therefore, that the U.S. government had to prove *mens rea* to establish that Morissette violated Section 641. *Id.*

ant to 75 Pa.C.S. § 3731(a)(4), driving with a blood alcohol of .10%, and the defendant was sentenced to less than ninety days imprisonment); *Commonwealth v. Koczwara,* 397 Pa. 575, 155 A.2d 825 (1959) (upholding absolute vicarious criminal liability for the sale of liquor to minors); *Commonwealth v. Rudinski,* 382 Pa.Super. 462, 555 A.2d 931 (1989) (absolute liability for parking violations); *Commonwealth v. Robinson,* 497 Pa. 49, 438 A.2d 964 (1981) (statutory rape is a strict criminal liability crime); *compare Denoncourt v. Commonwealth, State Ethics Com.,* 504 Pa. 191, 470 A.2d 945 (1983) (Section 404(d) of SEA unconstitutionally imposes criminal liability for noncompliance with reporting requirements with which a public official is not able to have the ability to comply and thereby violates the essence of our criminal law that imposes criminal liability for voluntary culpable acts). As we explained in *Koczwara,* "[s]uch so-called statutory crimes are in reality an attempt to utilize the machinery of criminal administration as an enforcing arm for social regulation of a purely civil nature, with the punishment totally unrelated to questions of moral wrongdoing or guilt." *Koczwara,* 397 Pa. at 580, 155 A.2d at 827–28.

Neither SEA nor SAIA, however, regulates or governs behavior that is the subject of the typical public welfare offense for which the legislature imposes absolute criminal liability. Both SEA and SAIA have the same legislative purpose, which is to increase public confidence in state government by providing criminal penalties involving a public office that is for financial gain or personal benefit. The earlier statute, SAIA, focuses on adverse interests in state contracts, whereas the later statute, SEA, applies to a wider variety of financial conflicts. These are very different concerns from those addressed by other absolute liability offenses such as violating traffic laws or statutes governing the distribution of liquor.

Also, both statutes impose serious penalties, which indicates that the General Assembly did not intend to eliminate the *mens rea* requirement. *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). A violation of

SAIA is a misdemeanor punishable by automatic forfeiture of state employment, up to a $1,000.00 fine and a year in prison. 71 P.S. § 776.8. A person who violates Sections 403(a), (b) or (c) of SEA is guilty of a felony and subject to a sentence of up to five years in prison and a $10,000.00 fine. 65 P.S. § 409. The severity of these punishments is a "further factor tending to suggest" that the legislature did not intend to eliminate a *mens rea* requirement. *Staples*, 511 U.S. at 618, 114 S.Ct. at 1803.

Additionally, common law crimes like bribery traditionally have a *mens rea* requirement. *Morissette.* Bribery occurs when a "judge, or other person concerned in the administration of justice, takes any undue reward to influence his behaviour in his office." 4 William Blackstone, Commentaries *139. A related common law crime, extortion, consists of "any officer's unlawfully taking, by colour of his office, from any man, any money or thing of value, that is not due to him, or more than is due, or before it is due." *Id.* at *141. By proscribing the use of public office for personal financial gain or other benefit, SEA and SAIA are direct descendants of these common law crimes that impose a culpability requirement and the legislature, therefore, is less likely to have silently eliminated culpability. *Id.*

Finally, we have held that criminal intent or guilty knowledge is an essential element of the offense when the proscribed conduct necessarily involves deceitful acts and acts of fraud. *Commonwealth v. Lurie*, 524 Pa. 56, 569 A.2d 329 (1990). Both SEA and SAIA involve deceiving the State for the personal benefit of the employee. Therefore, they "necessarily involve" a *mens rea* requirement pursuant to *Lurie.*

## CONCLUSION

To summarize, because neither the face nor the subject of the statutes indicates a legislative intent to impose absolute criminal liability, and because the penalties are severe and the statutes derive from common law crimes, we disagree with the Superior Court and conclude that SEA and SAIA do not

impose absolute criminal liability and hold that they are subject to the culpability requirements of Section 302.

We find, however, that the Commonwealth did not err in prosecuting Parmar pursuant to Section 4701 of the general Crimes Code as opposed to the more specific statutory offenses found in SAIA and SEA because Section 4701 required proof of the additional element of violation of a known legal duty. Therefore, the Commonwealth's prosecution did not violate the *Warner* rule.

Accordingly, we affirm the Order of the Superior Court on other grounds.

FLAHERTY, C.J., and CASTILLE, J., join this Opinion in Support of Affirmance.

## *OPINION IN SUPPORT OF REVERSAL*

ZAPPALA, Justice.

Although I agree that the State Adverse Interest Act and the State Ethics Act do not impose absolute criminal liability, I would hold that Parmar's conviction under the bribery provision of the Crimes Code, 18 Pa.C.S. § 4701, did not violate the rule articulated in *Commonwealth v. Warner*, 504 Pa. 600, 476 A.2d 341 (1984).

"It is the policy of the law not to permit prosecutions under the general provisions of a penal code when there are applicable special penal provisions available." *Commonwealth v. Brown*, 346 Pa. 192, 199, 29 A.2d 793, 796–97 (1943). In *Brown*, the appellants were indicted on charges of perjury under the Penal Code of 1939 and violations of the Election Code of 1937 arising from allegedly false affidavits made to nomination petitions. The issue presented was whether the penal provisions of the Election Code exclusively controlled prosecutions for making false affidavits to nomination petitions. We held that any person who was charged with knowingly making false statements in any affidavit required by the Election Code must be prosecuted under the penal provisions of the Election Code, and not on a charge of perjury under the Penal Code.

We determined that there was nothing in the Penal Code manifesting a legislative intention that its general provisions should prevail over the specific provisions of the Election Code that governed the appellees' conduct.[1] We cautioned against presuming that the legislature intended to provide for two different prosecutions for the same identical offense, prosecutions which may result in "widely divergent penalties," where both general and specific provisions governing the same conduct exist. This caution evolves from the fundamental principle that citizens should be able to understand what conduct is prohibited by the law.

> Blackstone in Book 4, section 2, says that "to know with precision what the laws of our country have forbidden, and the deplorable consequences to which a wilful disobedience may expose us, is a matter of universal concern." To hold that defendants charged as were these appellants, are for the same act, subject to prosecutions under penal provisions of *both* these two separate acts is to eschew the ideal of *precision* in criminal law and criminal penalties which Blackstone holds before us.

346 Pa. at 197–98, 29 A.2d at 796 (emphasis supplied).

We quoted with approval the decision in *United States ex rel. Palmer v. Lapp,* 244 F. 377 (6th Cir.1917), which had reiterated "the principle that general legislation must give way to specific legislation on the same subject and held that *the general provisions in a law must be so interpreted as to embrace only cases to which the special provisions, on the same subject are not applicable."* 346 Pa. at 200, 29 A.2d at 797 (emphasis added). Thus, *Brown* requires that a defendant be prosecuted under specific penal provisions rather than general provisions, except where the specific provisions are inapplicable.

---

1. In reaching this conclusion, we applied the principle of statutory construction governing conflicts between general provisions of a law and specific provisions in the same or another law that was set forth in the applicable Statutory Construction Act, which was then found at 46 P.S. § 563. The language of § 563 is virtually identical to the language of § 1933 of the current Statutory Construction Act, 1 Pa.C.S. § 1933, which is cited in the opinion in support of affirmance.

*Commonwealth v. Warner,* 504 Pa. 600, 476 A.2d 341 (1984), falls within the exception envisioned in *Brown* for cases where specific penal provisions are inapplicable. In *Warner,* the appellee was charged with theft by deception under the Crimes Code and a violation of the Public Welfare Code's prohibition against false statements for representing that she had no income during a period in which she received public assistance. Prior to trial, the common pleas court had granted the appellee's motion to dismiss the felony count under the Crimes Code because the misdemeanor count under the Public Welfare Code was found to encompass the identical conduct. The court concluded that the appellee could be prosecuted only under the specific provisions of the Public Welfare Code. The Superior Court affirmed.

We reversed the Superior Court and remanded the case for trial on both counts of the original information because the Commonwealth's theory of the case indicated a possibility that the appellee's conduct was not governed completely by the Public Welfare Code. The Commonwealth asserted that evidence of the appellee's failure to inform welfare authorities of earnings received after her initial application for assistance would establish the theft charge under the Crimes Code, but would not establish willful false statements or misrepresentation under the Public Welfare Code because the appellee had not made any statements whatsoever to the welfare authorities. We found that because the case was only in the pre-trial stages when the appeal was taken, the factual background necessary to determine whether the Commonwealth could successfully proceed with its theory of the case was lacking. Without a complete record, we could not determine whether the appellee's conduct violated both the specific provisions of the Public Welfare Code and the general provisions of the Crimes Code.

Since the statutes could be interpreted so as to give effect to each for certain periods of time, remand was necessary. We stated that

theft by deception and the false statements section of the Welfare Code involve distinct elements. There is no irrec-

oncilable conflict between them on their face, and any actual conflict between them can only be determined when the facts of the case are fully developed. *It may well appear that the same acts on appellee's part constituted violations of both statutes. If so, prosecution under the Welfare Code alone is permitted.* On the other hand, different acts by appellee may have violated each statute independently.

504 Pa. at 609, 476 A.2d at 345–46 (emphasis added).

This demonstrates very clearly that *Warner* does not stand for the proposition in the opinion in support of affirmance that prosecution may proceed on a general provision simply because the provision involves distinct elements from the specific provision. Rather, if the conduct violates both the general provision and the specific provision, prosecution may proceed only on the specific provision. Applying *Warner* to this case, it is apparent that Parmar's conduct violated both the general provision of the Crimes Code prohibiting bribery as well as the specific provisions of the State Ethics Act and the State Adverse Interest Act. The Commonwealth did not establish separate acts committed by Parmar that independently violated the Crimes Code. To the contrary, as found by the opinion in support of affirmance, the "violation of a known legal duty as public servant," required for bribery under 18 Pa.C.S. § 4701(a)(3), was based upon evidence of violations of the State Ethics Act and the State Adverse Interest Act.

Accordingly, I would reverse the order of the Superior Court.

CAPPY, J., joins this Opinion in Support of Reversal.

## OPINION IN SUPPORT OF REVERSAL

NIGRO, Justice.

I also would reverse, but write separately because I believe that *Warner* does not apply. Rather, this case should be decided following the analysis set forth in *Commonwealth v. Brown*, 346 Pa. 192, 29 A.2d 793 (1943), as explained by Justice Zappala in his Opinion in Support of reversal.

In *Brown,* the defendants allegedly made false statements in affidavits to nomination petitions. They were charged with perjury under the Penal Code of 1939, and violations of the Election Code of 1937 for their false affidavits. The *Brown* Court held that where an act violates both general and specific provisions of two separate statutes, and there are applicable special penal provisions available, it is the policy of the law not to permit prosecutions under the general provision. 346 Pa. at 199, 29 A.2d at 796–97.

Here, as in *Brown,* a specific statute directly governed appellant's conduct. In *Brown,* the Election Code, which sought to prevent election fraud, prohibited the making of false affidavits. In this case, the State Ethics Act (SEA) and the State Adverse Interest Act (SAIA), are enacted to deter and punish those who seek to use their public office to realize personal gain. The rationale of *Brown,* that the Commonwealth should prosecute under the statute that best applies to the type of conduct sought to be eliminated, indicates that here, the Commonwealth should have proceeded under the SEA and the SAIA, not the general bribery provision.

Appellant was a PennDOT engineer, a public official, who took money from an individual seeking approval from Penn-DOT for a Highway Occupancy Permit (HOP). This is exactly the type of conduct both the SEA and the SAIA seek to prevent. Because appellant's conduct violated the SEA and the SAIA, the rational of *Brown* governs this case, and appellant should have been prosecuted under those specific statutes rather than the general statute.

*Commonwealth v. Warner,* 504 Pa. 600, 476 A.2d 341 (1984), is an exception to the principle of law created in *Brown* requiring a defendant to be prosecuted under specific penalty provisions rather than general provisions. In *Warner,* this Court addressed whether the Commonwealth could preliminarily proceed to trial on two separate statutory provisions, one specific, and one general, where the Court could not determine from the record whether the general and specific statutory provisions encompassed identical conduct. This Court held the Commonwealth was not restricted from pursu-

ing both charges through trial until a determination could be made by the trial court as to whether prosecution under the special statute would fail. Therefore, because of the procedural posture of *Warner*, its holding is limited to cases arising in a pre-trial context.

The instant case arises in a post-trial context, and implicates whether the Commonwealth may prosecute under a general statute when a more specific statute is available. Because the Commonwealth could have proceeded under the SEA and the SAIA, the rationale of *Brown* speaks directly to the heart of this matter, "when there are applicable (specific) penal provision available" the Commonwealth cannot prosecute under the general statute. *Brown*, 346 Pa. at 199, 29 A.2d at 796–97. Accordingly, I would reverse.