22 A.3d 223

**Kenneth KISTLER, Appellee**

v.

**COMMONWEALTH of Pennsylvania, STATE ETHICS COMMISSION, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 1, 2009.

Decided June 22, 2011.

518

[redacted]

Brian Dennis Jacisin, PA State Ethics Commission, for State Ethics Commission.

Edmund J. Healy, Steckel and Stopp, Slatington, for Kenneth Kistler.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice McCAFFERY.

The State Ethics Commission (hereinafter "the Commission") appeals from the order of the Commonwealth Court reversing the Commission's determination that Kenneth Kistler (hereinafter "Appellee") had violated two provisions of the Public Official and Employee Ethics Act (hereinafter "Ethics Act").[1] We affirm.

The following summary of the relevant facts is excerpted from the Commonwealth Court opinion and the Commission's final adjudication. *Kistler v. State Ethics Commission,* 958 A.2d 1092 (Pa.Cmwlth.2008); Final Adjudication of the State Ethics Commission, dated 6/29/07 (hereinafter "Commission's Adjudication"). Appellee was a member of the Carbon–Lehigh Intermediate Unit (hereinafter "CLIU") Board of Directors (hereinafter "the Board"),[2] serving, from January 1998 until March 18, 2002,[3] as chairman of the building committee,

1. Act of Oct. 15, 1998, P.L. 729, No. 93, 65 Pa.C.S. §§ 1101–13.

2. The Board is comprised of one representative from each of fourteen school districts. Commission's Adjudication at 3.

3. The date that Appellee became chair of the building committee is variously reported as January 1988 (*see Kistler,* 958 A.2d at 1094);

which was charged with pursuing the Board's interest in various construction projects. In addition, Appellee is the owner and president of two businesses, Kistler Building Supply, Inc., and Kistler Pole Building Company.

In late 1999, the Board began to explore the possibility of constructing a garage in which to house its buses. Staff member Robert J. Keegan, Jr., was placed in charge of the garage construction project, and in June 2001, he began discussions concerning the project with Dale Roth, an architect who had previously worked for the CLIU. Sometime between February 2002, and March 18, 2002, Mr. Roth told Appellee that the design for the planned garage might involve a pole building,[4] and Appellee agreed to provide pricing and planning information for the project. Subsequently, Appellee informed the executive director of the CLIU that he was resigning from the building committee because of his possible business involvement with construction of the garage. At the March 18, 2002 meeting of the Board, Appellee's resignation from the building committee was accepted. The solicitor for the CLIU opined that, although Appellee could properly participate in the construction of the garage, he should abstain from any votes of the Board relating to that project. The Board, with Appellee abstaining, voted to make Mr. Roth's architectural firm, known as Roth Marz Partnership, its agent in pursuing a lease-purchase agreement for the proposed garage site.

In May 2002, Mr. Roth made an initial commitment to Appellee that Kistler Pole Building Company, Appellee's business, would be chosen to construct the garage. The construction arrangements were formalized on July 12, 2002, with a written contract between Kistler Pole Building Company and Cornerstone LLC, another of Mr. Roth's businesses. At its July 15, 2002 meeting, the Board, with Appellee again abstain-

---

January 1998 (*see* Commission's Adjudication at 4); and December 20, 1999 (*see id.* at 14, 62).

4. A pole building is defined as "a quickly constructed building in which vertical poles are secured in the ground to serve as both the foundation and framework." Oxford Dictionaries, oxforddictionaries.com.

ing, approved a sales agreement, a lease agreement, and an option agreement with Cornerstone LLC. Appellee filed two conflict of interest abstention memoranda, both dated August 19, 2002, explaining that he had abstained from Board votes on March 18, 2002, and July 15, 2002, because of his company's possible participation in the construction of the garage. Kistler Pole Building Company started construction of the garage in September 2002, and completed the project in February 2003.

While planning the garage construction, the Board was also occupied with a second facility, the Lehigh Learning and Adjustment School (hereinafter "the School"). On June 17, 2002, after it became apparent that the building in which the School was then housed had a mold problem, the Board terminated its lease and authorized Mr. Roth to pursue construction of a new facility. Appellee voted in favor of both of these actions. In April 2003, after Appellee learned that Mr. Roth was considering a pole building design for the School, Appellee ceased any involvement with the Board on the School project. At a meeting on October 20, 2003, the Board authorized Mr. Roth to begin construction of the School, and on May 17, 2004, the Board approved a lease agreement between Mr. Roth and the CLIU for the School. Appellee abstained from both votes. On June 17, 2004, Appellee and Mr. Roth executed an agreement under which Kistler Pole Building Company would construct the building for the School.

By letter dated August 4, 2004, the Commission notified Appellee that he was being investigated for possible violations of the Ethics Act. Appellee contacted counsel, specifically, the law firm of the CLIU solicitor, to inquire as to whether he would be in violation of the Ethics Act if he were to fulfill his contractual obligations to construct the School. In a letter dated August 27, 2004, counsel opined that Appellee had not violated the Ethics Act. Appellee then began construction of the School in September 2004, and completed it in January 2005.

The Commission held hearings concerning its allegations against Appellee, and thereafter concluded that Appellee had

unintentionally violated the Ethics Act via three actions. First, the Commission determined that Appellee had violated subsection 1103(a), the conflict of interest provision, on June 17, 2002, when he had voted to authorize Mr. Roth to pursue construction of the School while simultaneously seeking a subcontract from Mr. Roth for construction of the garage. In addition, the Commission determined that Appellee had violated subsection 1103(f) by entering into subcontracts with Mr. Roth's businesses for construction of the garage and the School, respectively on July 12, 2002, and on June 17, 2004, because the Board had not solicited and accepted competitive bids prior to awarding the contracts to Mr. Roth. The Commission concluded that all the alleged violations were unintentional because Appellee had voted and had entered into the subcontracts in reliance on the solicitor's legal advice.

The Commonwealth Court reversed in a published opinion in which it concluded that Appellee had not intended his June 17, 2002 vote on the School to lead to his subcontract with Mr. Roth for construction of the garage, and that there was no evidence that the vote did indeed lead to the garage subcontract. *Kistler*, 958 A.2d at 1100 & n. 15. In addition, the Commonwealth Court concluded that the Ethics Act, with its requirement of "an open and public process" in subsection 1103(f), did not mandate use of a competitive bidding process. *Id.* at 1098.

We granted the Commission's Petition for Allowance of Appeal as to the following questions:

a.  Whether a public official may violate § 1103(a) of the Public Official and Employee Ethics Act, 65 Pa.C.S. § 1103(a), despite lacking the intent to use his office for private pecuniary gain.

b.  Whether § 1103(f) of the Public Official and Employee Ethics Act requires competitive bidding.

*Kistler v. State Ethics Commission*, 601 Pa. 314, 972 A.2d 482 (2009).

■  Both of the questions presented are issues of statutory interpretation, specifically of the Ethics Act. Statutory inter-

pretation is a question of law, for which our standard of review is *de novo,* and our scope is plenary. *St. Elizabeth's Child Care Center v. Department of Public Welfare,* 600 Pa. 131, 963 A.2d 1274, 1276 (2009); *see Malt Beverages Distributors Ass'n v. Pennsylvania Liquor Control Board,* 601 Pa. 449, 974 A.2d 1144, 1154 (2009) (citing *Seeton v. Pennsylvania Game Commission,* 594 Pa. 563, 937 A.2d 1028, 1037 (2007) for the proposition that "while courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court").

■ The object of all statutory interpretation is to ascertain and effectuate the intention of the General Assembly, giving effect, if possible, to all provisions of the statute. 1 Pa.C.S. § 1921(a). In general, the best indication of legislative intent is the plain language of a statute. *Malt Beverages, supra* at 1149. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S. § 1921(b). Words of the statute are to be construed according to their "common and approved usage." 1 Pa.C.S. § 1903(a).

The first issue on appeal is whether a public official who does not have the intent to use his or her office for private pecuniary gain may nonetheless violate subsection 1103(a) of the Ethics Act. Subsection 1103(a) bars a public official from engaging in conduct that constitutes a conflict of interest, where conflict of interest is defined in relevant part as the "[u]se by a public official . . . of the authority of his office . . . for the private pecuniary benefit of himself . . . or a business with which he . . . is associated." 65 Pa.C.S. § 1102 (emphasis added). There is no explicit intent element in subsection 1103 or in the definition of conflict of interest. However, the lack of an explicit intent element does not end our inquiry, as we must consider the plain meaning of the entire statutory text.

As the Commonwealth Court has previously emphasized, to violate subsection 1103(a), a public official must "**use**" his or her office for private pecuniary benefit. *Kraines v. Pennsyl-*

*vania State Ethics Commission,* 805 A.2d 677, 681 (Pa. Cmwlth.2002). The word "use" is not defined in the Ethics Act. The dictionary definition of the noun "use" is "[t]he act of using or putting to a purpose[, *e.g.,*] the use of a car;" analogously, the definition of the verb "use" is "1. [t]o bring or put into service or action: employ[, *e.g.,*] use a pen [or] use your imagination[, or] 2. to put to some purpose: avail oneself of[, *e.g.,*] use the bus to get to work." Webster's II New College Dictionary, Houghton Mifflin Co., 1995, at 1215. Thus, the common and approved usage of the word "use," which must guide our inquiry, indicates an action directed toward a purpose. Accordingly, to violate subsection 1103(a), a public official must act in such a way as to put his office to the purpose of obtaining for himself a private pecuniary benefit. Such directed action implies awareness on the part of the public official of the potential pecuniary benefit as well as the motivation to obtain that benefit for himself.

That the General Assembly intended such an interpretation of subsection 1103(a) is strengthened by a declaration in the Ethics Act's purpose provision: "The Legislature hereby declares that public office is a public trust and that any **effort** to realize personal financial gain through public office other than compensation provided by law is a violation of that trust." 65 Pa.C.S. § 1101.1(a) Purpose (emphasis added). The dictionary defines "effort" as "[e]xertion of physical or mental energy to do something." Webster's II New College Dictionary at 360. In other words, an effort is an activity directed toward a goal. Accordingly, pursuant to the Ethics Act, violation of the public trust arises from activity directed toward the goal of realizing personal financial gain through public office. This is entirely consistent with the understanding of the word "use" in the context of the statutory definition of "conflict of interest" set forth above.

The Commonwealth Court has considered the Ethics Act's conflict of interest provision in numerous cases, and the facts and holdings of those cases provide instructive examples of that court's understanding of how a public official may "use" his office in violation of subsection 1103(a). Two cases, with

different outcomes, involved the acceptance by public officials of excess, unauthorized compensation. In *McGuire v. State Ethics Commission*, 657 A.2d 1346 (Pa.Cmwlth.1995),[5] the Commission concluded that two board members of a township sanitary authority had used their public offices to obtain personal financial gain, and thus had violated the Ethics Act, by receiving monthly meeting pay that was greater than had been authorized, as required, by the township commissioners. Importantly, the two board members in question had not participated in any action or vote to determine the pay at issue; indeed, their excess compensation resulted from an erroneous practice that had begun years before they had even joined the board. *Id.* at 1348–49 & n. 6. The Commonwealth Court reversed the decision of the Commission, determining that the board members had not acted in any way to facilitate their receipt of compensation to which they were not entitled. *Id.* at 1351. The Commonwealth Court summarized its conclusion as follows:

> The [Commission's] belief that mere acceptance of a check constitutes "use" of a public office reaches beyond the limits of the normal interpretation of that term in the context provided.... Mere mistaken acceptance by a public official of a compensation check in an amount that was determined prior to his term in office is devoid of the type of action needed to constitute "use" of office for the purpose of obtaining personal financial gain.

*Id.* at 1351–52.

The Commonwealth Court distinguished the circumstances in *McGuire* from those of an earlier case, *Yocabet v. Pennsylvania State Ethics Commission*, 109 Pa.Cmwlth. 432, 531 A.2d 536 (1987), in which the court rejected the petitioner's argu-

**5.** *McGuire* was decided under earlier versions of the Ethics Act; however, any differences from the current version of the Ethics Act are not important to the *McGuire holding. See McGuire*, 657 A.2d at 1347 n. 1 and 1351; *see also* Title 65 Appendix, Part II, Chapter 11, Historical and Statutory Notes (stating that the Act of October 15, 1998, P.L. 729, No. 93 § 2(a) provides as follows: "Except as otherwise specifically provided in [the Ethics Act], it is the intention of this act to continue existing law.")

ment that he had not violated the Ethics Act because it had not been his intention to use his office for private financial gain. In *Yocabet*, a township supervisor had voted to appoint himself to the township office of secretary/treasurer and then had accepted compensation for this office that had not been set by the township auditors, as required by law. Although the Second Class Township Code permits township supervisors to appoint themselves to township offices, it also requires the township auditors to set the compensation for the offices under such circumstances. *Id.* at 538. The Commonwealth Court affirmed the Commission's finding that the *Yocabet* petitioner had violated the Ethics Act because he received unauthorized compensation for an office to which he had acted to appoint himself. The Commonwealth Court did not find it determinative that the supervisor had not intended to violate the Ethics Act. *Id.* at 539.

The *McGuire* court distinguished *Yocabet* as follows:

While *Yocabet* does not require intent in order to find [that] a violation of Section 3(a) of the Ethics Act has occurred, it does not mean that a public official does not have to take action to fall within that section's prohibition.... "Use" of public office requires action by a public official that in some way facilitates his receipt of compensation to which he is not entitled, such as in *Yocabet* where the individual voted to increase his own salary without having authority to do so. Mere mistaken acceptance by a public official [such as in *McGuire*] of a compensation check in an amount that was determined prior to his term in office is devoid of the type of action needed to constitute "use" of office for the purpose of obtaining personal financial gain.

*McGuire, supra* at 1351–52.

Thus, the determinative distinction drawn by the Commonwealth Court between *Yocabet* and *McGuire* focused on whether the unauthorized compensation derived from the public official's **use** of his office. In *Yocabet*, a township supervisor used his office to appoint himself to a position for which he then accepted excess, unauthorized compensation. In contrast, in *McGuire*, although the public officials also accepted

excess, unauthorized compensation, the error that had led to the unauthorized compensation was made years prior to their terms of office and they had not acted to initiate or perpetuate the error in any way. Thus, while the *Yocabet* supervisor had "used" his office to appoint himself to a higher-paying position, the board members in *McGuire* had not so "used" their office, but merely had accepted the pre-determined compensation that they believed, mistakenly, to have been properly authorized.[6]

It is also instructive to compare two other cases in which the Commonwealth Court considered possible conflicts of interest arising from the creation of a new position by a local authority. In *Pulice v. State Ethics Commission,* 713 A.2d 161, 163–64 (Pa.Cmwlth.1998), the Commonwealth Court declined to find any violation of the Ethics Act by a school board president who had participated in discussions and votes regarding the creation of a new administrative position to which his son-in-law was subsequently appointed. At the time of the creation of the new position, there were no applicants, and there was no evidence that the son-in-law would ultimately be appointed. The Commonwealth Court determined that the new position was created for the benefit of the entire school district, not to promote or to benefit the president's son-in-law. In concluding that there was no conflict of interest, the Commonwealth Court stated, "[t]here is no evidence at all from which it can be inferred, rather than speculated, that [the school board president-petitioner] 'used his authority' for

6. We also note that *Yocabet* was decided under the 1978 version of the Ethics Act, in which Section 3(a), the provision at issue, read in relevant part as follows:

No public official ... shall use his public office ... to obtain financial gain *other than compensation provided by law* for himself, a member of his immediate family or a business with which he is associated. 65 P.S. § 403(a), 1978, repealed (emphasis added to the relevant portion removed by amendments in the Act of June 26, 1989, P.L. 26). The *McGuire* court does not appear to conclude that this change to the law was dispositive, or even relevant. However, the *Yocabet* court emphasized that the compensation accepted by the supervisor-petitioner had not been authorized as required by law, and thus determined that he had obtained financial gain "other than compensation provided by law." *See Yocabet,* 531 A.2d at 537, 539.

the private pecuniary benefit of [his] son-in-law by voting for the creation of the new position." *Id.* at 164.

In contrast, in *Rebottini v. State Ethics Commission,* 160 Pa.Cmwlth. 157, 634 A.2d 743 (1993),[7] the Commonwealth Court concluded that board members of a municipal authority had violated the conflict of interest provision of the Ethics Act by creating multiple new officer positions, such that each board member could be appointed as an officer and thereby have his compensation set by the board. Notably, pursuant to the Municipality Authorities Act,[8] board members are authorized to create officer positions, appoint officers, and set officers' salaries. However, board members are not authorized to set their own salaries; rather, salaries of the board members are set by the governing body of the municipality. In *Rebottini,* the evidence demonstrated that board members had sought to be paid for their services; that their duties and responsibilities had not changed with their appointment as officers; and that they had voted to set their own compensation for their newly assumed officer positions. *Id.* at 745. Based on all the evidence presented, the Commission found, and the Commonwealth Court agreed, that the board members had created the new officer positions for the purpose of circumventing the requirement of the Municipality Authorities Act that board member salaries be set, not by the board itself, but by the governing body of the municipality. *Id.* at 747. Accordingly, the Commonwealth Court held that the board members' action was "an abuse of public office and [ ] precisely the type of conduct which the [Ethics] Act was intended to prevent." *Id.*

The result in *Rebottini* is distinguishable from that in *Pulice* by the motivation of the public officials, a question of fact. In *Rebottini,* the evidence established that the board members were motivated by a desire to increase their salaries for their service on the board. In contrast, in *Pulice,* there

7. *Rebottini* was decided under the 1978 version of the Ethics Act, Section 3(a). *See* n. 6, *supra.*

8. Act of May 2, 1945, P.L. 382, as amended, 53 P.S. §§ 301–401. The relevant provisions are §§ 309B and C.

was no evidence that the board president's motive was to attain a financial benefit for himself or his family.

Finally, in *Snyder v. State Ethics Commission,* 686 A.2d 843 (Pa.Cmwlth.1996), the Commonwealth Court considered a conflict of interest issue in the context of an award of a subcontract to a public official. The court affirmed the Commission's finding that a member of a township board of supervisors had violated the Ethics Act by participating in the board's deliberations as to two private development projects while also engaging in undisclosed business relationships with the developers of the projects. The supervisor-petitioner, who was the owner of a masonry company, had actively sought business contracts for stonework on the two projects from the developers during the time that he was consistently voting to approve and to further the projects in his capacity as a member of the board. *Id.* at 849 & n. 10, 11. The evidence indicated that the supervisor-petitioner had submitted a bid for stonework on the first project, had lined up installers to assist him, and had communicated with the architect and general contractor, all the while continuing to vote on issues concerning both projects, but never publicly disclosing his intention to secure a subcontract for his company. *Id.* at 849 n. 10. With regard to the second project, the supervisor-petitioner had initially voted against the developer's interests; however, after he had secured a business relationship with the developer, he consistently voted in the developer's favor, and indeed actively supported the developer's interests and needs. *Id.* at 849 n. 11. The Commonwealth Court concluded that the Commission's findings were fully supported by the evidence of record, and affirmed the Commission's determination that the supervisor-petitioner had violated the Ethics Act.

■ In accordance with the above Commonwealth Court cases, we now hold that to violate the conflict of interest provision in subsection 1103(a) of the Ethics Act, a public official must be consciously aware of a private pecuniary benefit for himself, his family, or his business, and then must take action in the form of one or more specific steps to attain that benefit. As informed by the Commonwealth Court deci-

sions discussed above, this interpretation derives from the plain meaning of the statutory definition of conflict of interest, which requires that a public official **use** the authority of his office for private pecuniary benefit. *See* text *supra;* 65 Pa.C.S. § 1103(a).[9]

■ Furthermore, we conclude, as did the Commonwealth Court, that the Commission erred here in determining that Appellee used his office for private pecuniary benefit and thus violated subsection 1103(a) of the Ethics Act. The Commission found that Appellee had violated subsection 1103(a) on June 17, 2002, when he voted to authorize Mr. Roth to pursue construction of the School, because at the same time, Appellee was actively seeking a contract with Mr. Roth for construction of the garage and had a reasonable expectation of receiving the contract. Commission's Adjudication at 76, 82. However, it is only speculation, based on the timing of events, that Appellee's June 17, 2002 vote on the School was motivated by private financial benefit. There is no evidence that Appellee had acted with awareness that his June 17, 2002 vote on the School could or would result in his receipt of a subcontract for construction of the garage. Nor is there any evidence that Appellee's vote actually constituted a step in his realization of the garage subcontract.

■ We do not dispute the Commission's general assertion that a public official violates the Ethics Act if he uses the authority of his office to award a contract to a developer for one project in order to obtain a subcontract from the same developer on a different project. However, the Commission must provide clear and convincing evidence, *see* 65 Pa.C.S. § 1108(g), that the public official's action was accompanied by awareness of the potential for private financial benefit and was

9. In the context of a criminal case, a majority of this Court has expressed the view that the Ethics Act does not indicate a legislative intent to impose absolute criminal liability. *Commonwealth v. Parmar,* 551 Pa. 318, 710 A.2d 1083, 1089–90, 1091 (1998) (Opinion in Support of Affirmance and Opinion in Support of Reversal). Because the analysis was largely based on principles of criminal law and was the product of a divided Court, it is not particularly instructive for the instant case.

undertaken as a step in attaining that benefit. Here, the Commission presented no evidence that Appellee's June 17, 2002 vote as to the School was either motivated by or led, directly or indirectly, to the subcontract he subsequently obtained to construct the garage. Without clear and convincing evidence that Appellee's vote was at least partially motivated by private pecuniary benefit, we cannot conclude that the Commission has established a violation of subsection 1103(a).

Although *Snyder, supra,* may have certain similarities to the instant case, the Commission's finding of Ethics Act violations in *Snyder* was grounded in evidence of improper conduct that is not present here. Similarly to the instant case, in *Snyder,* a township supervisor, who was the owner of a masonry company, sought and obtained subcontracts from the developers of two township construction projects. However, in contrast to the instant case, the evidence in *Snyder* supported the following findings: the supervisor repeatedly voted on the development projects at issue, and indeed actively promoted them, without disclosing his financial interest in the projects; he refused to complete and sign a form, which had been prepared by the township solicitor, declaring for the record the supervisor's financial interest in one of the projects; the supervisor began to vote in one developer's favor only after he had formed a business relationship with that developer; and the supervisor made it clear to several individuals that he was using his official position in the township to promote the interests of his business. *Id.* at 845–49 & n. 10 & 11. The Commission made no similar findings in the instant case.

In fact, the evidence here indicates that Appellee both disclosed his financial interest in the projects at issue and abstained from voting on projects in which he had a financial interest. Shortly after Mr. Roth approached Appellee concerning a possible business relationship with regard to the garage construction, Appellee resigned from the Board's building committee, and he abstained from any further votes on matters relating to the garage construction. *Kistler,* 958 A.2d at 1095. Importantly, Appellee sought and acted in

concert with the advice of the township solicitor. *Id.* at 1096 n. 8; Commission's Adjudication at 30, 40–41, and 46. Undisputed testimony established that Appellee did not attempt to influence the Board's deliberations with regard to the garage. Commission's Adjudication at 17, 18, 25, 30, and 39. Undisputed testimony also indicated that the Board chose to hire Mr. Roth for the garage and the School projects because the Board was satisfied with his previous work. *Id.* at 16, 24, 37–38. With regard to the School, it is undisputed that the Board's vote on June 17, 2002, to terminate the old facility's lease was prompted by the receipt, a month earlier, of a solicited study concerning a mold problem. *Kistler,* 958 A.2d at 1099. Only months later did Appellee learn that Mr. Roth was considering a pole building design for the school, which could implicate Appellee's company; Appellee then ceased any involvement with the Board on the School project and abstained from any votes thereon. *Id.* at 1096.

Thus, in contrast to the circumstances in *Snyder,* there is no evidence from which one could reasonably infer that Appellee's June 17, 2002 vote as to the School was related to or motivated by Appellee's private financial interest in obtaining a subcontract for the construction of the garage. We conclude, in agreement with the Commonwealth Court, that the Commission erred when it found that Appellee violated the conflict of interest provision in subsection 1103(a) of the Ethics Act.

■ The second issue before this Court concerns the Commission's finding that Appellee violated subsection 1103(f) of the Ethics Act, which provides in relevant part as follows:

**Contract.**—No public official ... or any business in which the [official] is associated shall enter into ... any subcontract valued at $500 or more with any person who has been awarded a contract with the governmental body with which the public official ... is associated, unless the contract has been awarded through **an open and public process,** includ-

ing prior public notice and subsequent public disclosure of all proposals considered and contracts awarded.

65 Pa.C.S. § 1103(f) (emphasis added).

The statutory phrase "an open and public process," which is not defined in the Ethics Act, is the focus of the parties' dispute. The Commission interprets the phrase to mean a meaningful opportunity for competitors to submit proposals, requiring actual public solicitation for proposals through public notice or advertisement; in other words, the Commission interprets subsection 1103(f) to mandate a competitive bidding process. Commission's Adjudication at 80; Commission's Brief at 41–42.

In the instant case, the Board had awarded contracts to the Roth businesses for construction of the garage and the School without publicly soliciting any competitive bids. Therefore, the Commission found that Appellee had violated subsection 1103(f) when he entered into subcontracts with Mr. Roth or the Roth businesses for construction of these facilities because the Board had awarded the contracts to the Roth businesses without "an open and public process." Commission's Adjudication at 82.

The Commonwealth Court reversed the Commission's decision, holding that it was error to construe subsection 1103(f)'s phrase "an open and public process" to mandate a competitive bidding process. *Kistler*, 958 A.2d at 1098. The Commonwealth Court set forth two general rationales for its decision. First, the Commonwealth Court suggested that when the General Assembly intends to mandate a competitive bidding process, it does so explicitly. As examples, the Commonwealth Court cited the Pennsylvania Convention Center Authority Act and the Third Class County Convention Center Authority Act, both of which provide that certain individuals shall not enter into a contract valued at $500 or more "unless the contract has been awarded **to the lowest responsible bidder** through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded." *Kistler, supra* at 1097–98

(citing 64 Pa.C.S. § 6017(c)(3) and 16 P.S. § 2399.16(c)(3)) (emphasis added by Commonwealth Court). Because the phrase "to the lowest responsible bidder" does not appear in subsection 1103(f) of the Ethics Act, the Commonwealth Court concluded that the "open and public process" required in the Ethics Act may be satisfied without a competitive bidding process.

Second, the Commonwealth Court looked to the Commonwealth Procurement Code, and noted that, although the general rule requires all Commonwealth agency contracts to be awarded by competitive bidding, there are numerous exceptions. *Kistler, supra* at 1098 (citing 62 Pa.C.S. §§ 511, 515(1), and 516 (respectively, general rule; exception applicable when only a single contractor is capable of providing the supply, service, or construction; and exception applicable for emergency procurements)); *see also* 62 Pa.C.S. §§ 514 and 515(2)-(10) (exceptions applicable, respectively, for small procurements and under miscellaneous circumstances). If subsection 1103(f) of the Ethics Act is interpreted to require competitive bidding, then any official who enters into a subcontract with a contractor chosen under one of these exceptions would violate subsection 1103(f). For example, a public official would violate subsection 1103(f) if he or she entered into a subcontract with a contractor chosen to address a threatened emergency under the emergency procurement exception. The Commonwealth Court argued that this is an absurd and unreasonable result, inconsistent with 1 Pa.C.S. § 1922(1), under which we presume that the General Assembly does not intend a result that is absurd or unreasonable. *Kistler, supra* at 1098 & n. 12.

Finally, the Commonwealth Court highlighted the General Assembly's recognition that "clear guidelines are needed in order to guide public officials [ ] in their actions." *Id.* at 1097 (quoting 65 Pa.C.S. § 1101.1(a)). To that end, the General Assembly specified its intent "to define as clearly as possible those areas which represent conflict with the public trust." *Id.* at 1097 (quoting 65 Pa.C.S. § 1101.1(a)). We agree with the Commonwealth Court that the Ethics Act simply does not expressly state or otherwise make clear a legislative intent

that the phrase "open and public process" invariably must mean a competitive bidding process.

Appellee provides numerous examples of statutes that specifically address procurement or public works and set forth specific procedures for contracting. For example, 53 P.S. § 53202(a), which pertains to the regulation of contracts by incorporated towns, provides in part as follows: "All contracts [ ] of incorporated towns in excess of ten thousand dollars . . . shall not be made except with and from the lowest responsible bidder, after due notice in one newspaper . . . at least three times at intervals of not less than three days. . . . The first advertisement shall be published not less than ten days prior to the date fixed for the opening of bids." *See also* 53 P.S. §§ 56802(a) and 68102(a) (setting forth similar, although not identical, requirements for, respectively, first class and second class townships). In addition, several statutory provisions set forth a requirement for separate bids for plumbing, heating, ventilation, and electrical work. *See, e.g.,* 53 P.S. § 1003 (pursuant to general municipal law, "it shall be the duty of the person or persons authorized to enter into contracts for the erection, construction, or alteration of such public buildings to receive separate bids upon each of the said branches of work, and to award the contract for the same to the lowest responsible bidder for each of said branches."); 53 P.S. §§ 53205 and 56805 (setting forth the same requirement with regard to, respectively, an incorporated town and a first class township). With regard to bridges, viaducts, and culverts, the Second Class County Code provides that "the county commissioners, in conjunction with the city, borough or township, . . . shall advertise for bids and award the contract to the lowest responsible bidder." 16 P.S. § 5855. With regard to waters and water supply, general municipal law requires that any public works or improvement involving an expenditure of more than $10,000 be "let to the lowest responsible bidder after due advertisement, once a week for two successive weeks in at least one newspaper of general circulation." 53 P.S. § 2863(a). For contracts of greater than $4,000, but less than $10,000, this statute requires that at least three price quota-

tions be requested, unless there are fewer than three qualified contractors in the market area. 53 P.S. § 2863(b). The Public School Code of 1949 also sets forth specific directives for contracting work related to the construction, repair, or maintenance of school buildings, which depend, *inter alia,* on the total cost of the contract and whether the work is necessitated by an emergency. 24 P.S. § 7–751. The general rule for work exceeding $10,000 requires the school district to award the contract to the lowest responsible bidder; however, under certain circumstances for work of lesser cost, the school board is not required to solicit competitive bids. 24 P.S. § 7–751(a), (a.1), and (b).

The Ethics Act is not a procurement statute, and there is no indication that the General Assembly intended it to constrain or modify the numerous statutory provisions, *e.g.,* those summarized above, that do set forth specific procedures for awarding contracts. Regardless of whatever statutory or regulatory provision may define the established procedures for awarding a public contract in any particular case, the Ethics Act sets forth the ethical standards to which the public officials involved are expected to conform. The Ethics Act "emphasizes guidance to public officials [ ] regarding [those] ethical standards," and intends to provide guidelines in as clear a way as possible. 65 Pa.C.S. § 1101.1(a) and (b). Accordingly, for these reasons, we decline to infer that when the General Assembly chose to use the phrase "an open and public process" in the context of subsection 1103(f), its actual intent was to specify a competitive bidding process.

In sum, we conclude that the Commonwealth Court correctly construed subsections 1103(a) and 1103(f) of the Ethics Act, and so we affirm.

Former Justice GREENSPAN did not participate in the decision of this case.

Justices EAKIN, BAER, and TODD join in the opinion.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice SAYLOR, concurring.

I agree with the majority that the Ethics Act does not require competitive bidding as a component of an "open and public process." 65 Pa.C.S. § 1103(f). For reasons that differ somewhat from the majority's rationale, I also agree that evidence of intent is necessary to prove a Section 1103(a) violation and that, accordingly, the Commonwealth Court properly reversed the Commission's determination that Kistler's conduct amounted to an "unintentional" conflict of interest.

Initially, to the extent the majority opinion can be read to suggest that any use of one's office for private gain cannot, by its nature, be unintentional, *see* Majority Opinion, at 522–23, 22 A.3d at 227, I respectfully disagree. It is possible to use many things unintentionally, and I see no reason why a public official cannot unintentionally use his office in a manner that privately benefits himself or another person within the statute's prohibition. *See* 65 Pa.C.S. § 1102 (defining conflict of interest). Here, moreover, there is a reasonable argument that Kistler did, in fact, use his public office to benefit himself. Although Kistler may not have known that he would ultimately be involved in constructing the school facility, he arguably stood to benefit from his action because voting in favor of Roth would naturally tend to encourage Roth to favor Kistler's company vis-à-vis the transportation facility. *Accord* Brief for Appellant at 40 ("Kistler ... voted to authorize additional business to Roth, at a time when Kistler had an ongoing business relationship with Roth.").[1] Therefore, I might be

1. In its report, the Commission explained its rationale in more detail, as follows:

[Kistler]'s June 17, 2002, vote in favor of authorizing Roth to pursue the construction of the [school] facility occurred precisely as [Kistler] was actively pursuing the contract to construct the Transportation facility.... We conclude that it is irrelevant that the particular project [Kistler] voted on, specifically the [school] facility, was a different project than the Transportation facility for which he was actively pursuing a contract. Both projects were CLIU projects with Roth or Roth organizations. In [Kistler]'s capacity as a public official, [Kistler] was in a position to vote to award the [school] facility work to Roth. In Roth's capacity as a general contractor for

inclined to find that a violation occurred if Section 1103(a) imposed strict liability.

However, I ultimately concur with the majority's holding that proof of intent is a necessary prerequisite to the finding of a violation of Section 1103(a). In *Commonwealth v. Parmar*, 551 Pa. 318, 710 A.2d 1083 (1998), a plurality of this Court indicated that Section 1103(a) should be understood to subsume a *mens rea* element because any transgression of that provision constitutes a felony punishable by up to five years in prison and a $10,000 fine. *See id.* at 332, 710 A.2d at 1090 (Opinion in Support of Affirmance) (stating that the severity of this punishment "is a 'further factor tending to suggest' that the legislature did not intend to eliminate a *mens rea* requirement" (quoting *Staples v. United States*, 511 U.S. 600, 618, 114 S.Ct. 1793, 1803, 128 L.Ed.2d 608 (1994))).[2]

I find this assessment persuasive. As I have previously described, strict-liability crimes represent a comparatively recent innovation in the law, inasmuch as they abandon the

the CLIU, Roth was in a position to award a subcontract to [Kistler] to construct the CLIU Transportation facility. Under the circumstances of this case, each of these individuals—[Kistler] as a public official and Roth as a CLIU general contractor—exercised the authority of his respective position in a manner that financially benefited the other.

*In re Kistler*, No. 04–037, Order No. 1441, *slip op.* at 76 (Pa. State Ethics Comm'n, June 11, 2007) ("Commission Report").

**2.** A majority of the *Parmar* Court concluded that the Act does not impose strict criminal liability. *See id.* at 334, 710 A.2d at 1091 (Opinion in Support of Reversal) ("I agree that the ... Ethics Act [does] not impose absolute criminal liability...."). The Commission argues that an intent element should not be recognized for purposes of administrative enforcement, as the Commission is unlikely to refer any but the most egregious cases for criminal prosecution pursuant to Section 1107 of the Act. *See* Brief for Appellant at 36–37 (citing 65 Pa.C.S. § 1107(13), (15)). However, the Commission does not contend that criminal prosecution may not be initiated in any other way, nor does it point to any standards that affirmatively require an administrative *mens rea* finding as a precondition for such a referral. Further, the Act defines *all* conflicts of interest to be felonies, *see* 65 Pa.C.S. § 1109(a), and makes no express distinction in this regard between intentional and unintentional conflicts. I therefore respectfully disagree, not only with the Commission, but with the majority's suggestion that the *Parmar* analysis is not instructive with regard to the present dispute. *See* Majority Opinion, at 529 n. 9, 22 A.3d at 231 n. 9.

historical and "intrinsic connection between culpability and condemnation." *Commonwealth v. Samuels*, 566 Pa. 109, 115, 778 A.2d 638, 643 (2001) (Saylor, J., concurring); *see also Morissette v. United States*, 342 U.S. 246, 256–58, 72 S.Ct. 240, 246–47, 96 L.Ed. 288 (1952) (recounting the historical development of strict criminal liability). *See generally United States v. Dotterweich*, 320 U.S. 277, 284, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943) ("Hardship there doubtless may be under a statute which ... penalizes [a] transaction though consciousness of wrongdoing be totally wanting."). As such, they ordinarily arise as so-called "public welfare offenses," *Morissette*, 342 U.S. at 255, 72 S.Ct. at 246, set forth in administrative legislation aimed at regulating conduct in the public interest by enforcing compliance with regulatory schemes. *See Da-Pra's Appeal*, 425 Pa. 94, 99–100, 227 A.2d 491, 494 (1967) ("These regulatory enactments, largely in the nature of police regulations, are generally referred to as *malum prohibitum*, and not requiring guilty knowledge as in the *malum in se* crimes."). Examples are Vehicle Code summary violations or Liquor Code vicarious offenses pertaining to an employee's sale of alcohol to minors. *See generally Commonwealth v. Jade E.*, 237 Pa.Super. 140, 145, 346 A.2d 562, 564 (1975). These types of offenses tend to carry relatively minor punishments, *see Morissette*, 342 U.S. at 256, 72 S.Ct. at 246; *Commonwealth v. Ludwig*, 583 Pa. 6, 27 n. 1, 874 A.2d 623, 635 n. 1 (2005) (Nigro, J., dissenting); *Samuels*, 566 Pa. at 117, 778 A.2d at 643 (Saylor, J., concurring) ("The justification for the application of strict liability in this context includes the observation that penalties for regulatory offenses, as well as impact upon reputation, are generally minimal."), and, indeed, as criminal penalties for absolute liability offenses enlarge, they become increasingly subject to constitutional challenge on due process grounds. *See Samuels*, 566 Pa. at 117 n. 6, 778 A.2d at 643 n. 6 (Saylor, J., concurring) (quoting *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir.1960)); *cf. Lambert v. California*, 355 U.S. 225, 228–30, 78 S.Ct. 240, 243–44, 2 L.Ed.2d 228 (1957); *Commonwealth v. Koczwara*, 397 Pa. 575, 586, 155 A.2d 825, 830 (1959) (expressing that imprisonment for vicarious offenses would contravene due process). While

the law has tolerated the removal of the scienter prerequisite from some discreet elements of serious offenses—such as with regard to the age element where the victim of a sexual crime is under fourteen years old, *see* 18 Pa.C.S. § 3102; *Commonwealth v. Robinson*, 497 Pa. 49, 53, 438 A.2d 964, 966 (1981)—strict criminal liability nonetheless remains "disfavored and of questionable validity" in many contexts. *Samuels*, 566 Pa. at 116, 778 A.2d at 643 (Saylor, J., concurring).

Here, the General Assembly has prescribed that severe criminal penalties may be imposed for any violation of Section 1103(a). It has also classified such a violation as a felony, a classification that makes it particularly unlikely that the Legislature intended Section 1103(a) to define a strict-liability offense. *See Morissette*, 342 U.S. at 260–61, 72 S.Ct. at 248–49. Hence, I agree with the *Parmar* plurality that the legislative body should be understood to have intended to require proof of some level of mental culpability in connection with the conflict-of-interest statute. *See generally Koczwara*, 397 Pa. at 582, 155 A.2d at 828 (developing that whether a culpable mental state is a necessary ingredient of a statutory offense is a matter of statutory interpretation).[3] That being the case, it is necessary to consult the *mens rea* provision of the Crimes Code.

Under Section 302, a person is not guilty of an offense unless he acts intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each material element. *See* 18 Pa.C.S. § 302(a). If, however, the law defining the offense does not specify the minimum requisite level of culpability, a person can only be deemed to have committed any element of that offense if he "acts intentionally, knowingly or recklessly with respect thereto." *Id.* § 302(c).

The Commission determined that Kistler's violation was "unintentional" because he "acted based upon his understand-

3. As the majority notes, the declared purpose underlying the Act is phrased in terms of prohibiting "efforts" to use public office for private gain. *See* Majority Opinion, 522–23, 22 A.3d at 227–28 (quoting 65 Pa.C.S. § 1101.1(a)). In my view, and consistent with the majority's analysis, this supports the conclusion that Section 1103(a) was not intended to define an absolute-liability offense.

ing of the legal advice he had received from the CLIU Solicitor." Commission Report, *slip op.* at 77. By using "unintentional" in this manner, the Commission does not appear to have been referring to the definition of that term as set forth in Section 302(b) of the Crimes Code.[4] Rather, the "unintentional" qualifier utilized by the Commission was evidently meant to signify that Kistler lacked any guilty mental state, as he acted based on the legal advice he received from the CLIU solicitor, who construed the Ethics Act to permit Kistler's participation in the June 17, 2002, vote. Thus, it cannot reasonably be said that, for example, the Commission would have concluded that Appellant acted knowingly or recklessly, as those terms are defined in the Crimes Code, with respect to the prohibition against conflicts of interest.[5]

In light of the above, I would hold that, to establish a violation of Section 1103(a), and in accordance with Section 302(c) of the Crimes Code, the Commission must prove that the accused acted intentionally, knowingly, or recklessly with regard to each material element of the conflict-of-interest offense, and that the Commission's present determination that

4. *See* 18 Pa.C.S. § 302(b)(1) ("A person acts intentionally with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.").

5. Section 302 defines "knowingly" and "recklessly" as follows:
   (2) A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.
   (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.
   18 Pa.C.S. § 302(b)(2), (3).

Kistler's conduct amounted to an "unintentional" conflict, when read in the full context of its report, reflects its belief that his mental state did not rise to any of those levels of scienter. Accordingly, I concur with the majority's holding that the Commission's ultimate finding of a Section 1103(a) violation cannot be sustained.

Chief Justice CASTILLE joins this Concurring Opinion.